## Commonwealth *versus* Abner Kneeland.

Under *St.* 1782, *c.* 8, (Revised Stat. *c.* 130, § 15.) the denial of God, his creation government, or final judging of the world, made wilfully, that is, with the intent and purpose to calumniate and disparage him and impair and destroy the reverence due to him, is blasphemy.

Under the same statute, cursing or contumeliously reproaching God, is blasphemy.

If the general averment in an indictment under this statute, alleges blasphemy in both of these modes, and if the language recited by way of specification and imputed to the defendant, amounts to such a denial, but without a contumelious reproaching, or amounts to a contumelious reproaching, but without a denial, the indictment is sufficient.

On an indictment for wilfully blaspheming the holy name of God, by denying God, his creation, &c. in the following words, viz. "The Universalists believe in a god which I do not ; but believe that their god, with all his moral attributes, (aside from nature itself,) is nothing more than a chimera of their own imagination," it was *held*, that after a conviction, if no evidence was erroneously admitted or rejected and no incorrect instructions to the jury in matter of law were given, it was to be taken as proved, that this language was used in the sense of a denial of God, and under the circumstances and with the intent and purpose laid in the indictment, so as to bring it within the statute.

The statute is not intended to prohibit the fullest inquiry and freest discussion for all honest and fair purposes, one of which is the discovery of truth ; nor to prevent the simple and sincere avowal of disbelief in the existence and attributes of a supreme, intelligent being, upon suitable and proper occasions ; nor to prevent or restrain the formation of any religious opinions or the profession of any religious sentiments whatever ; but it is intended to punish a denial of God, made with a bad intent, and in a manner calculated to give just offence ; and with this construction the statute is not repugnant to the 2d article of the Declaration of Rights, which declares that no subject shall be hurt, molested or restrained for his religious profession or sentiments, provided he does not disturb the public peace or obstruct others in their religious worship.

This statute (when applied to printed blasphemy) is not repugnant to the 16th article of the Declaration of Rights, which declares that the liberty of the press ought not to be restrained.

This article was intended to secure to the citizen the general liberty of publishing without the previous license of any officer of the government, but not to restrain the legislative power in relation to the punishment of injuries to individuals, or of the disturbance of the peace, by malicious falsehoods or obscene or profane publications or exhibitions.

THIS was an indictment, alleging that the defendant, on December 20, 1833, unlawfully and wickedly composed, printed and published in a newspaper called the Boston Investigator, of which he was the editor and publisher, a certain scandalous, impious, obscene, blasphemous and profane libel, in which he " did wilfully blaspheme the holy name of God, by denying and contumeliously reproaching God, his creation, govern

ment, and final judging of the world, and by reproaching Jesus Christ and the Holy Ghost, and contumeliously reproaching the holy word of God." The indictment then sets forth an obscene article from the newspaper, concerning Jesus Christ, and extracts from another article turning into ridicule the subject of addressing prayers to God. It then alleges that the libel, in another part of it " contains the following scandalous, profane and blasphemous words, matters and things, of and concerning God, and of and concerning Jesus Christ, and of and concerning the final judging of the world by God, and of and concerning the holy scriptures, to wit : —

' 1. Universalists believe in a god which I do not ; but believe that their god, with all his moral attributes (aside from nature itself) is nothing more than a mere chimera of their own imagination.

' 2. Universalists believe in Christ, which I do not ; but believe that the whole story concerning him is as much a fable and a fiction as that of the god Prometheus, the tragedy of whose death is said to have been acted on the stage in the theatre at Athens, five hundred years before the Christian era.

' 3. Universalists believe in miracles, which I do not ; but believe that every pretension to them can be accounted for on natural principles, or else is to be attributed to mere trick and imposture.

' 4. Universalists believe in the resurrection of the dead, in immortality and eternal life, which I do not ; but believe that all life is mortal, that death is an eternal extinction of life to the individual who possesses it, and that no individual life is, ever was, or ever will be eternal :'

To the great scandal and contumelious reproach of God, and his holy name, his creation, government, and final judging of the world, of Jesus Christ, and the Holy Ghost, of the holy word of God, and of the Christian religion, against the peace," &c.

The indictment was found at the Municipal Court, January term 1834, and at the same term the defendant was tried, convicted, and sentenced to imprisonment for three months in the common gaol. From this judgment he appealed to the Supreme Judicial Court, and at November term 1835 he was tried before *Wilde* J. and convicted.

Common-
wealth
v.
Kneeland.

The defendant moved for a new trial, because the judge instructed the jury, that the publication complained of in the indictment amounted to a denial of God ; and because the verdict was against the law, and against the constitution.

The judge made a report of the case as follows : —

" This was an indictment, in which the defendant was charged with writing and publishing a profane and blasphemous libel ; and at the trial upon the general issue, the attorney general relied principally upon the following part of the publication, namely, ' Universalists believe in a god which I do not ; but believe that their god, with all his moral attributes (aside from nature itself) is nothing more than a chimera of their own imagination.'

The defendant admitted the writing and publishing of the libel ; and the questions submitted to the jury were, whether the publication was in violation of the statute of 1782, c. 8, against blasphemy ; and whether that statute is a constitutional law.

I instructed the jury, that the above stated passage from the publication set forth in the indictment, in its obvious grammatical construction, would amount to a denial of the existence of any God ; but that if from the whole publication they should be of opinion that such was not the meaning of the writer, they should find accordingly.

I also instructed the jury, that the wilful denial of the existence of any God, except the material universe itself, would be a violation of the statute of 1782, c. 8 ; and that the statute was a constitutional law.

If any of these instructions were wrong, the verdict is to be set aside, and a new trial granted."

The defendant also moved in arrest of judgment, for the following reasons : —

1. Because the facts alleged in the indictment do not constitute any offence, either by the common law, or by any statute.

2. Because the St. 1782, c. 8, entitled " An Act against Blasphemy," on which the indictment is founded, is contrary to the constitution of Massachusetts.

3. Because that statute is in conflict with and contrary to

the laws on the subject of naturalization, made by Congress, pursuant to the constitution of the United States.

4. Because it is not averred in the indictment, that the words complained of were falsely or maliciously published.

The cause was argued by the defendant, *pro se*, and by *Austin*, Attorney-General, on the part of the Commonwealth.

The *Attorney General* said that at the trial he relied upon the passage quoted in the judge's report, to sustain the prosecution, the other words recited in the indictment being referred to only as explanatory of this particular passage, and as evidence of the motives with which it was written and published.

The *defendant's* remarks related principally to the motion in arrest. He argued that the facts alleged do not constitute an offence. The paragraph recited in the judge's report, is only the expression of a disbelief, not a denial. A disbelief implies that one is not satisfied of the existence of a fact; which is only a doubt; a denial imports that one is satisfied that a supposed fact does not exist; which is a positive assertion. Nor is the paragraph in question the expression of a disbelief in the God of the statute, but in the God of the Universalists. In other words, I meant to state that I did not believe in the doctrine of the Universalists, not that I did not believe in a God. And this is confirmed by the mode of printing, the word *god* being begun with a small letter, and not having a comma after it; whereas in the subsequent clause, " Universalists believe in Jesus Christ, which I do not," the punctuation is different, as I did intend to say that I did not believe in Christ. The sentence is not " Universalists believe in God," but " in *a* god," which is followed by " *their* god," the article and pronoun showing that a god of a particular description was intended. I had no occasion to deny that there was a God; I believe that the whole universe is nature, and that God and nature are synonymous terms. I believe in a God that embraces all power, wisdom, justice, and goodness. Every thing is god. I am not an atheist, but a pantheist.

But a more important inquiry is, whether the statute against blasphemy be a constitutional law. The 2d article in the Declaration of Rights asserts that no subject shall be hurt,

Common-
wealth
*v.*
Kneeland.

*March 8th*,
1836.

Common-
wealth
*v.*
Kneeland

molested or restrained, in his person, liberty or estate, *"for his religious profession or sentiments* ; provided he doth not disturb the public peace, or obstruct others in their religious worship."  This provision ought not to receive a narrow technical construction.  With the qualification in the proviso, it was intended to secure perfect freedom in regard to professions and sentiments on the subject of religion ; to protect every species of belief and unbelief.  It prohibits the legislature from interfering in questions of heresy, and all prosecutions on account of religion are intended to be abolished. If the legislature or courts are to define religious sentiments, those which are religious to-day may be irreligious to-morrow, according as one sect or another shall be dominant in the Commonwealth, and the constitution will be subverted.  Nor can it be argued that the constitution applies merely to opinions secretly entertained ; the enjoyment of concealed opinions cannot be restrained by human institutions, for so long as mind exists it must think ; but it was the promulgation of opinions which required and which has received protection. The friends of truth must trust to reason for its support, and not to courts of justice.  See Professor Stuart's letter to Dr. Channing, on the subject of Religious Liberty, (1830,) *p*. 14 to 17.

The statute in question is repugnant also to the 16th article of the Declaration of Rights, viz.  " The liberty of the press is essential to the security of freedom in a State ; it ought not therefore to be restrained in this Commonwealth."  This guaranties to me the strict right of propagating my sentiments, by way of argument or discussion, on religion or any other subject.  I do not contend, however, that a man who slanders his neighbor in print, shall not be answerable for the injury which he inflicts.

The statute is in collision with the laws of Congress, enacted under the authority of the constitution of the United States, on the subject of naturalization.  The Jew, Mahometan, Gentoo, may be made citizens.  May they not bring their religious opinions with them and propagate them ?  May not the Christian denounce and ridicule the religion of Mahomet, and if so, may not the Mahometan, in turn, denounce and ridicule the religion of Christ ?

*Austin*, Attorney General, said the statute contemplates one offence, namely, blaspheming the name of God, but different modes are specified in which the offence may be committed. One of these is the simple denial of God, unaccompanied with cursing or contumeliously reproaching God. The discussion, in decent language, of all the other subjects mentioned in the statute, is left open ; but the denial of God, whether in decent language or otherwise, is prohibited. The indictment alleges a violation of the statute, by denying God, and the jury have found that the language used by the defendant means such a denial, and that it was published from bad motives. This is conclusive of the defendant's having committed the offence charged, unless the instruction of the judge was erroneous. But nothing can be plainer than that the word *God* was used by the legislature to denote that Supreme, Intelligent Being who is alike revered by Christians, Jews and Mahometans, and not the material universe, which the defendant would substitute.

The Attorney General also argued, that the statute was in accordance with the constitution.

Shaw C. J. delivered the opinion of a majority of the Court. This cause was argued some time since, and partly on account of the intrinsic difficulty attending some of the questions raised in the case, and a difference of opinion among the judges on some of those questions, it has stood over for consideration and advisement, to the present time.

The indictment may be considered both as a charge of composing, printing and publishing an impious, obscene and blasphemous libel, and also as a direct charge of the crime of blasphemy. It is perhaps immaterial, whether the present indictment be considered as principally charging the one or the other ; because, although these offences are in many respects, technically distinct, and may be differently charged, yet the same act may and often does constitute both ; and the present indictment contains averments applicable to both. The latter consists in blaspheming the holy name of God, by denying, cursing or contumeliously reproaching God, his creation, government or final judging of the world ; and this may be done by language orally uttered, which would not be a

*Common wealth v. Kneeland.*

*April 28 1838*

Common-
wealth
*v.*
Kneeland.

libel ; but it is not the less blasphemy, if the same thing be done by language written, printed and published, although when done in this form it also constitutes the offence of libel.

The case was argued both on a motion in arrest of judgment, and on a motion for a new trial, on a report made by the judge who presided at the trial.   It is perhaps a subject of regret, that the cause was argued by the defendant himself, without the aid of counsel competent to assist him, since it may leave some reason to apprehend, that the questions really intended to be submitted to the consideration of the Court, may not have been presented in the manner best adapted to a clear and satisfactory statement and discussion of them.   The defendant however had a perfect right thus to conduct his defence ; and it is in no other respect a subject of regret, than that it throws upon the Court some embarrassment, arising from the difficulty of comprehending the precise grounds of defence, which the defendant intended to take at the trial, and which he wishes the Court now to revise.

The indictment charges the defendant in the terms of the statute, by alleging that he did, at the time and place, &c., wilfully blaspheme the holy name of God, by denying and contumeliously reproaching God, his creation, government and final judging of the world ; and it proceeds to allege the means of doing this to be, by composing, printing and publishing a libel, setting out in terms, various passages from that publication.   Among other parts of this libel, the following passage was relied on, connected with evidence of the intent and purpose of the publication, to prove the blasphemy, by denying God, and his creation, government and final judging of the world, viz.  " Universalists believe in a god which I do not ; but believe that their god, with all his moral attributes (aside from nature itself) is nothing more than a mere chimera of their own imagination."   The other parts of the publication, many of which are set out at large in the indictment but which it is not necessary to repeat, were relied upon, to show the sense, in which the language was used, and the intent, design and purpose, with which it was used.

The motion in arrest of judgment, relies mainly upon two grounds ;

1. That the language of the defendant, as set forth in the indictment, is not such as to constitute blasphemy, within the true meaning and construction of the statute ; but if held otherwise, then,

2. That the statute itself is contrary to the constitution of the Commonwealth; and therefore that the statute itself is inoperative and void.

That part of the provision of the statute, on which the question arises, is as follows ; " That if any person shall wilfully blaspheme the holy name of God, by denying, cursing, or contumeliously reproaching God, his creation, government, or final judging of the. world," &c. *St.* 1782, *c.* 8. This provision is reënacted in the same terms by the revised statutes. Revised Stat. *c.* 130, § 15.

In order to pass a proper judgment upon the construction and operation of the statute, it becomes necessary to ascertain with as much clearness as practicable, what is intended to be prohibited by it, under the term " blasphemy."

In general, blasphemy may be described, as consisting in speaking evil of the Deity with an impious purpose to derogate from the divine majesty, and to alienate the minds of others from the love and reverence of God. It is purposely using words concerning God, calculated and designed to impair and destroy the reverence, respect, and confidence due to him, as the intelligent creator, governor and judge of the world. It embraces the idea of detraction, when used towards the Supreme Being ; as " calumny " usually carries the same idea, when applied to an individual. It is a wilful and malicious attempt to lessen men's reverence of God, by denying his existence, or his attributes as an intelligent creator, governor and judge of men, and to prevent their having confidence in.him, as such. Blackstone, according to his usual mode of describing each offence in the shortest possible terms in which it may be made intelligible, speaks of it as " blasphemy against the Almighty, by denying his being or providence." 4 Bl. Comm. 59.

These definitions and descriptions from lexicographers and 'aw writers, might be indefinitely multiplied ; but it would throw little light on the subject. So in the earlier statutes of

the Colonial and Provincial governments, though they multiply epithets, and in some respects change the phraseology, they do not essentially alter the idea.    That of the Colony, in 1646, was in this form ; " If any person shall wittingly and willingly presume to blaspheme the holy name of God, Father, Son, or Holy Ghost, with direct, express, presumptuous, or high handed blasphemy, either by wilful or obstinate denying the true God, or his creation, or government of the world," &c.    Anc. Charters, &c., 58.

The Provincial Act of 1697 is thus expressed ; " If any person shall presume wilfully to blaspheme the holy name of God, Father, Son, or Holy Ghost, either by denying, cursing or reproaching the true God, his creation or government of the world," &c.    Anc. Charters, &c., 302.

In all these different descriptions of the offence, one idea is common to them all, which is, that the wilful denial of God, and of his creation and government of the world, with an intent and purpose to impair and destroy the reverence due to him, is the offence intended to be prohibited.

With these views of what is intended to be prohibited and made penal by the statute, the question again recurs, whether this crime and offence is properly and sufficiently charged in this indictment.    After verdict, all the facts legally and properly charged in the indictment, must be taken to be true, and the only question is, whether these facts, when proved, constitute a legal and indictable offence.    The offence is charged nearly in the words of the statute.    After the usual introductory averments of unlawful intent and disposition, and after alleging the publication of the libel by the defendant, describing it in general terms, and describing him as the editor and publisher, it proceeds to aver, that the defendant did wilfully blaspheme the holy name of God, by denying and contumeliously reproaching God, his creation, government and final judging of the world, and by reproaching Jesus Christ and the Holy Ghost, and contumeliously reproaching the holy word of God.    It then proceeds to cite sundry passages, from the publication thus characterized, as particular instances, and specifications of the general charge thus made, among which are those afterwards alluded to.

We believe it is a well settled rule in considering indictments, that where an offence may be committed in any one of several different modes, and the offence, in any particular instance, is alleged to have been committed in two or more modes speci-- fied, it is sufficient to prove the offence committed in any one of them, provided that it be such as to constitute the substantive offence. So where the offence is charged in general terms, and specifications are given, if any one of the specifications will support the substantive charge of crime, it is sufficient. The statute manifestly contemplates various modes, in which the offence may be committed, as by denying, or cursing, or con- tumeliously reproaching God, his creation, government, or final judging of the world, or by cursing or reproaching Jesus Christ or the Holy Ghost, or by cursing or contumeliously reproaching the holy word of God. *St.* 1782, *c.* 8. These are obviously alternatives, and either one of the acts consti- tutes the offence contemplated. Now, although the indict- ment charges the offence to be committed in several of the modes contemplated, yet if it is done in either of the modes, by the act imputed to the party indicted, it is a sufficient charge of the offence, and if proved, would be a sufficient ground of conviction, although the instances cited and speci- fied, would not constitute a sufficient charge of the offence in all the modes included in the general averment. The statute strongly marks two modes, by which one may wilfully blas- pheme, to wit, by denying God, his creation, government or final judging of the world, or, by cursing or contumeliously reproaching God. If the general averment alleges blasphemy in both these ways, and if the language cited by way of speci- fication, and imputed to the defendant, does amount to a denial of God, his creation, &c., but does not amount to a contu- melious reproach, or on the contrary, if it amounts to the latter, but not to the former, it is sufficient, because it contains the substantive charge of wilfully blaspheming.

Among the specifications in support of the general aver ment, and the one mainly relied on, to sustain the charge of denying God and his creation, government and final judging of the world, are those in relation to the Universalists, alleged to be wilfully uttered, of and concerning God, &c.

1. "Universalists believe in a god which I do not; but believe that their god, with all his moral attributes (aside from nature itself) is nothing more than a mere chimera of their own imagination.

2. Universalists believe in Christ, which I do not; but believe that the whole story concerning him is as much a fable and a fiction as that of the god Prometheus, the tragedy of whose death is said to have been acted on the stage in the theatre at Athens, 500 years before the Christian era.

3. Universalists believe in miracles, which I do not; but believe that every pretension to them can either be accounted for on natural principles, or else is to be attributed to mere trick and imposture.

4. Universalists believe in the resurrection of the dead, in immortality and eternal life, which I do not; but believe that all life is mortal, that death is an eternal extinction of life to the individual who possesses it, and that no individual life is, ever was, or ever will be eternal."

It is a general rule of construction, in actions of slander, indictments for libel, and other analogous cases, where an offence can be committed by the utterance of language, orally or in writing, that the language shall be construed and understood in the sense in which the writer or speaker intended it. If therefore obscure and ambiguous language is used, or language which is figurative or ironical, courts and juries will understand it according to its true meaning and import, and the sense in which it was intended, to be gathered from the context, and from all the facts and circumstances under which it was used. There is no doubt that the language cited, if used in the connexion and with the intent and purpose charged in the indictment, will amount to the offence contemplated in the statute; for although the form of the expression used by the defendant, was a denial of his belief, if under this form a wilful denial of the existence of God, his creation, &c., was intended, the language is sufficient to constitute a denial, within the meaning of the statute. Whether they were used with such unlawful intent and purpose, was a question upon the whole indictment and all the circumstances, and after verdict, if no evidence was erroneously admitted or re-

jected, and no incorrect directions in matter of law were given, it is to be taken as proved, that the language was used in the sense, and under the circumstances, and with the intent and purpose, laid in the indictment, so as to bring the act within the statute. However the law may have stood prior to 1782, the act then passed obviously intended to make a marked distinction between those acts which go to the denial of any God, and those affecting the Christian religion ; in regard to the former, it is made unlawful and punishable, wilfully to blaspheme the holy name of God, by denying God, his creation, government, and final judging of the world ; whereas in regard to the other, it can only be by cursing or reproaching Jesus Christ, &c., and not by any denial. The true meaning of the statute therefore, in this respect, seems clear and plain. But the word " deny " need not be used in the commission of the offence ; any words equivalent in meaning, used with the same purpose and design, must be deemed to have the same legal effect. The law does not look to the language alone, but to the ideas of which that language is the intelligible expression.

2. But another ground for arresting the judgment, and one apparently most relied on and urged by the defendant, is, that this statute itself is repugnant to the constitution of the Commonwealth, and therefore wholly void.

It seems now to be somewhat late to call in question the constitutionality of a law, which has been enacted more than half a century, which has been repeatedly enforced, and the validity of which, it is believed, until this prosecution, has never been doubted, though there have been many prosecutions and convictions under it. It was itself a revision of the colonial and provincial laws, to the same effect, already cited. It was passed very soon after the adoption of the constitution, and no doubt, many members of the convention which framed the constitution, were members of the legislature which passed this law. In 1820 another convention was called to revise the constitution, the subjects of religious freedom and of universal toleration were long and earnestly discussed, but no suggestion was made, that the statute of 1782, against blasphemy, was in violation of the Declaration of Rights. More

Commonwealth
v.
Kneeland

recently, upon a general and careful revision of our whole body of statute law, the law in question was reënacted, with some unimportant modifications, not affecting the present question.   Revised Stat. *c.* 130, § 15.

In New Hampshire, the constitution of which State has a similar declaration of rights, the open denial of the being and existence of God, or of the Supreme Being, is prohibited by statute, and declared to be blasphemy.

In Vermont, with a similar declaration of rights, a statute was passed in 1797, by which it was enacted, that if any person shall publicly deny the being and existence of God or the Supreme Being, or shall contumeliously reproach his providence and government, he shall be deemed a disturber of the peace and tranquillity of the State, and an offender against the good morals and manners of society, and shall be punishable by fine, and be bound to his good behaviour.

The State of Maine also, having adopted the same constitutional provision with that of Massachusetts, in her declaration of rights, in respect to religious freedom, immediately after the adoption of the constitution, reënacted the Massachusetts statute against blasphemy, with unimportant modifications.

In New York the universal toleration of all religious professions and sentiments, is secured in the most ample manner. It is declared in the constitution, *art.* 7, § 3, that the free exercise and enjoyment of religious worship, without discrimination or preference, shall for ever be allowed in this State to all mankind ; with the only limitation, that the liberty of conscience, thus secured, shall not be so construed as to excuse acts of licentiousness, or justify practices inconsistent with the peace or safety of the State.   Notwithstanding this constitutional declaration, carrying the doctrine of unlimited toleration as far as the peace and safety of any community will allow, the courts have decided that blasphemy was a crime at common law, and was not abrogated by the constitution. *People v. Rugg'es*, 8 Johns. R. 225.

But in order to test this argument more closely, that the statute against blasphemy is unconstitutional, it becomes necessary to consider those clauses in the Declaration of Rights which are supposed to be violated by this law.

It is contended that it is opposed to the 16th article, which provides that " the liberty of the press is essential to the security of freedom in a state ; it ought not therefore to be restrained in this Commonwealth." The obvious intent of this provision was to prevent the enactment of license laws, or other direct restraints upon publication, leaving individuals at liberty to print, without the previous permission of any officer of government, subject to responsibility for the matter printed. According to the argument attempted to be drawn from this article, every act, however injurious or criminal, which can be committed by the use of language, may be committed with impunity, if such language is printed. Not only therefore would the article in question become a general license for scandal, calumny and falsehood against individuals, institutions and governments, in the form of publication, a form in which it would be the most injurious, and most speedily, certainly and extensively diffused ; but all incitation to treason, assassination, and all other crimes however atrocious, if conveyed in printed language, would be dispunishable. A mere statement of the direct and obvious consequences of the doctrine contended for, shows that it cannot be sound. The manifest object of the Declaration of Rights was, to give the most explicit and abiding sanction to some of the general principles, supposed to be essential to the maintenance of free government, for the general guidance and regulation, as well of the legislature as of the people. The intention of the article in question was, to insure the general right of publication, at the same time leaving every citizen responsible for any offence capable of being committed by the use of language, as well when printed, as when oral, or in manuscript. Any other construction of the article would be absurd and impracticable, and inconsistent with the peace and safety of the State, and with the existence of free government.

The other article supposed to be violated by this law, is the second, and is as follows ;

" It is the right, as well as the duty, of all men in society, publicly, and at stated seasons, to worship the Supreme Being, the great creator and preserver of the universe. And no subject shall be hurt, molested, or restrained, in his person,

liberty, or estate, for worshipping God in the manner and sea·
son most agreeable to the dictates of his own conscience ; or
for his religious profession or sentiments ; provided he doth
not disturb the public peace, or obstruct others in their re-
ligious worship." In order to ascertain whether the statute
against blasphemy is contrary to the letter or to the spirit of
this constitutional article, it is necessary to ascertain what the
statute in fact prohibits, and then see whether the act thus pro-
hibited, is one which the article allows. For this purpose it
is necessary again to recur to what has been already stated to
be the legal effect of the statute. It makes it penal wilfully to
blaspheme the holy name of God, &c. The word " *wilfully*,'
in the ordinary sense in which it is used in statutes, means not
merely " voluntarily," but with a bad purpose, and in this
statute must be construed to imply an intended design to ca-
lumniate and disparage the Supreme Being, and to destroy the
veneration due to him. It does not prohibit the fullest in-
quiry, and the freest discussion, for all honest and fair pur-
poses, one of which is, the discovery of truth. It admits the
freest inquiry, when the real purpose is the discovery of truth,
to whatever result such inquiries may lead. It does not pre-
vent the simple and sincere avowal of a disbelief in the
existence and attributes of a supreme, intelligent being, upon
suitable and proper occasions. And many such occasions
may exist ; as where a man is called as a witness, in a court of
justice, and questioned upon his belief, he is not only permitted,
but bound, by every consideration of moral honesty, to avow
his unbelief, if it exist. He may do it inadvertently in the
heat of debate, or he may avow it confidentially to a friend, in
the hope of gaining new light on the subject, even perhaps
whilst he regrets his unbelief ; or he may announce his doubts
publicly, with the honest purpose of eliciting a more general
and thorough inquiry, by public discussion, the true and honest
purpose being the discovery and diffusion of truth. None of
these constitute the wilful blasphemy prohibited by this statute.

Taking this to be the true meaning, intent and construction
of this statute, the Court are of opinion that it is not repug-
nant to the second article of the Declaration of Rights. That
article is to be expounded with reference to every other clause

and provision of the constitution, and to its whole spirit and character as a system of government, to be gathered from all its constituent parts, and from the existing laws, the known prevailing principles, and other circumstances of the times in which it was made and adopted. Its object was to secure the utmost possible latitude of toleration for every species of religious sentiment, and for the avowal or profession of every species of religious opinion. But taking it in connexion with other parts of the constitution, and especially with the third article, which is too familiar to need citation, it is impossible to believe that the authors of this article intended to prohibit the legislature from reënacting a law, which had been in force from the first settlement of the country, a law thought essential to preserve the sanction of oaths, prescribed and required in every clause almost of the constitution, and which had hitherto been deemed essential to the peace and safety of society. The question is not, whether the makers of the constitution were right in this belief, or whether, if the constitution were now to be made, it would be wise to enlarge or restrict the powers of the legislature in this behalf; but if from the article as it stands, taken in connexion with the whole constitution, it cannot be clearly inferred that it was their intention to repeal the laws against blasphemy, and prohibit the legislature from reënacting them, then it cannot be maintained that this act of the legislature is unconstitutional and void. But understanding the statute against blasphemy as we do, and as we have already explained it, that it is not intended to prevent or restrain the formation of any opinions or the profession of any religious sentiments whatever, but to restrain and punish acts which have a tendency to disturb the public peace, it is not repugnant to, but entirely consistent with, this second article of the Declaration of Rights. Such being the opinion of the Court, the motion to arrest the judgment cannot be sustained, on either ground.

3. The other questions arise upon the motion for a new trial, founded on the exceptions to the charge of the Court in matters of law, as stated in the report. The report is very brief and relates only to two points. One of the principal difficulties in the case has arisen, not so much from any differ-

Common wealth v. Kneeland.

ence of opinion as to the nature of the crime of blasphemy, or of the constitutionality of the statute prohibiting and punishing that offence, as from the form of this report, and the few and brief terms in which the exceptions are stated. Some of the Court were apprehensive, considering the form of this report, that the cause was left to the jury upon grounds too narrow and restricted, instead of being fully left to them upon the whole merits, embracing all questions of law and fact, including of course the fact of publication and the motive, intent and purpose with which it was made. This apprehension was somewhat strengthened by an admission made by the attorney general, at the argument, that on the trial, he relied mainly on that part of the publication mentioned in the report, viz., " Universalists believe in a god which I do not ; but believe that their god, with all his moral attributes (aside from nature itself) is nothing more than a chimera of their own imagination," as constituting the gist of the offence, referring however to all the other parts of the publication, for proof of the *quo animo*, and to show the sense in which the words were used ; from which there was reason to apprehend that, especially as the defendant did not avail himself of the aid of counsel to state his defence and his exceptions, that the jury might have understood the judge to charge, that a mere avowal of disbelief in the being of God, would bring one within the operation of the statute, without regard to the occasion, intent or purpose of mind with which it was done. If such had been the charge, it would have been impossible, we think, to sustain it, in point of law, and the verdict ought to be set aside. But upon the strictest examination of this report, a majority of the Court are of opinion, that the report is not to be so understood. The report is not and does not profess to be, a statement of the whole course, or of any considerable part, of the proceedings at the trial. The true way of considering the questions reserved by it is this. In criminal cases, by the form in which the issue is made up, the jury pass upon the whole matter of law and fact. It is the duty of the judge to give such instructions to the jury in matters of law, as in his judgment may be best calculated to aid and assist them in forming their verdict. But he is not bound to give instructions, upon any

particular questions, unless his attention is called to them, and they are particularly requested, in which case, if pertinent, instructions will be given, and if the judge thinks proper, he will reserve the question of their correctness. But the presumption is, after verdict, that all necessary and proper instructions, in matter of law, for the aid and information of the jury, were given, and it must of necessity be presumed that such instructions were legally correct, where no exceptions have been taken and no points reserved. We are not therefore at liberty to presume, that the jury were instructed, or left to understand, that a mere avowal of disbelief in the being of God, &c., would constitute the crime prohibited by the statute ; but they must have understood, that to constitute the crime of blasphemy, the language of the defendant, explained and understood by the context, must have amounted to a wilful denial of God, his creation, government and final judging of the world, with the unlawful intent and purpose necessary to constitute such denial blasphemy, and that upon the whole evidence, the jury found the use of such language, with such unlawful intent ; and the report furnishes no ground to believe that such finding was against the evidence. Such are the legal and necessary presumptions from the record, and unless contradicted or controlled by the report, they must stand. All then that appears or can be legally inferred from the report is, that out of a general charge upon the law and the evidence, embracing the general merits of the prosecution, two or three points were selected, to which exceptions were taken, and a very short report was made of so much of the charge as to make them intelligible. If these exceptions cannot be sustained, the general presumption in favor of the verdict must prevail

The first exception turns upon a question of grammatical construction. The sentence quoted is this ; " Universalists believe in a god which I do not." It was contended by the defendant, that from the use of a small letter in the word god, and from the punctuation, the grammatical construction was, that it was used in a peculiar sense, as the creed, or tenets, or form of belief, of the Universalists, as we speak of the god of the Mahommedans, or Hindoos, or Chinese, the being under-

stood, conceived and apprehended by the Mahommedans or Pagans respectively, and that the same form of words was no* unfrequently used among different sects of Christians. The opinion expressed by the Court was, that in its obvious grammatical construction, it was equivalent to a denial of his belief in the existence of any God, that is, any God other than the material universe ; but it was at the same time stated to the jury, that they were not bound to understand that the meaning was to be wholly learned from such grammatical construction, if from the whole publication they were of opinion, that such was not the meaning of the writer. The Court are of opinion, that this construction was correct. It is perhaps extremely immaterial, because the jury were authorized and directed to ascertain the meaning from the whole publication, under which direction a minute and critical grammatical construction would probably be regarded as of minor importance.

4. The other exception is attended with more difficulty ; but upon full consideration, a majority of the Court are of opinion, that the difficulty arises rather from the brief and perhaps too unqualified form in which the report is made, than from any misdirection actually given. It is stated thus in the report. " I also instructed the jury, that the wilful denial of the existence of any God, except the material universe itself, would be a violation of the statute, and that the statute was a constitutional law."

From this sentence, taken without its known connexion with the record, with the evidence actually before the Court, and the grounds taken for the prosecution and defence, as a naked, insulated statement, it might appear to have been stated as law, that a wilful, that is, intentional or purposed denial of the existence of any God, other than the material universe, without regard to the motive, design or purpose, would constitute blasphemy, within the statute. But we think, from the known state of the questions before the Court, and the arguments used, that this instruction was given with the qualifications and illustrations, which the state of the case required ; that the term " wilful," in this report, does not merely mean " designed " or " intentional," but has a much more extensive and significant meaning. It was contended on the part of the

defendant, that to constitute wilful blasphemy within the statute, there must be some cursing or contumelious reproach of God. But it was contended on the part of the prosecution, that the statute is in the alternative, and that it indicates several modes in which wilful blasphemy may be committed. That one is, by denying God, his creation, government and final judging of the world ; another, by cursing or contumeliously reproaching God, &c. ; and another by cursing or reproaching Jesus Christ, &c. It was in regard to this controverted point, which lay at the foundation of the prosecution, that the judge was called on to give an opinion. And we think, from a fair construction of the report, that he instructed the jury that a wilful denial of God, his creation, &c., that is, a denial with the injurious, unlawful intent, to impair and destroy the veneration due to him, as an intelligent creator, governor and final judge of the world, implied in the word *wilful*, did constitute the offence intended to be prohibited and punished by the statute, although no words of malediction, reproach or contumely towards God, Jesus Christ, or the Scriptures, were coupled with it. Understood in this sense, the Court are of opinion that the instruction was correct, and that the exception cannot be maintained.

Morton J. dissenting. It is with great reluctance that I offer my views of this case. I am aware of the importance of the questions involved in it, and of the intrinsic difficulties and peculiar liability to misapprehension, which attend their discussion. But having formed, from the best lights within my reach and the fullest examination in my power, some opinions different from those of my learned brethren, and having come to an opposite result, I do not feel at liberty to withhold them. For however highly I may respect the judgments of others, I cannot implicitly yield to them ; and however deeply I may distrust my own, I am bound to be governed by its dictates.

I have also some apprehension that all the grounds which might have been relied upon in defence, have not been raised and presented so clearly and fully as they might have been. The defendant availing himself of his constitutional right to manage his own cause, and being not only unused to technical

Commonwealth
v.
Kneeland.

forms and the mode of conducting trials, but unversed in some of the distinctions and principles of criminal law, and the authorities by which they are supported, has been unable to render us all the aid in raising or discussing the points essential to his defence, which might have been derived from the learning and experience of a professional advocate. Indeed, but for the voluntary interposition of the presiding justice, the defendant's strongest and only available objection to the verdict would have been lost to him, either by his omission to except. or by his express waiver. And notwithstanding this desire on the part of the Court, to preserve to the defendant all his legal rights, it cannot be known that grounds of defence did not exist, which have never been brought to our knowledge. But as far as the facts are presented and the points raised, by the record or the very brief report of the trial, the Court have taken care that the defendant should not suffer for the want of counsel. Beyond this it is not in our power to go.

Two principal questions are presented for our consideration. The first, which arises upon the record, looks to the final termination of the prosecution. The last, which grows out of the report of the instruction to the jury, asks only for another trial.

The defendant relies mainly upon the former, and to this, as the most important, has addressed the most of his arguments. He contends that no judgment can be rendered on the verdict, because the statute upon which the indictment is founded is unconstitutional and void. He argues that it materially trenches upon the freedom of conscience, the freedom of discussion, and the freedom of the press. These rights, essential to the enjoyment of rational liberty, and indispensable requisites in all free governments, are expressly guarantied and anxiously guarded in our constitution. But they are supposed to be peculiarly liable to abuse, and it is an imperious, though perhaps somewhat difficult duty, to preserve them from this infirmity. In the shadowy confines between their enjoyment and their abuse, it may not be easy to draw a clear and definite line of demarkation, by which we may walk without danger of transcending it.

The statute, which is very brief, is in these words. " If any

person shall wilfully blaspheme the holy name of God, by denying, cursing or contumeliously reproaching God, his creation, government or final judging of the world, or by cursing or reproaching Jesus Christ, or the Holy Ghost, or by cursing or contumeliously reproaching the holy word of God," he shall be punished in the manner prescribed.

This statute, the defendant contends, is in contravention of the last clause of the second article of the Bill of Rights, and so far as relates to printed blasphemies, of the sixteenth article of the same.

In examining the constitutionality of a legislative enactment, we should proceed with caution and diffidence. The power of declaring inoperative and void, a statute regularly passed with the forms and by the authority prescribed by the constitution, is a high and delicate, if not a dangerous power; and one which every wise court will exercise with a great deference for the decision of a coördinate department of the government. Cases may exist in which it may become the duty of a court, even of a jury, and perhaps other public officers, to regard a statutory enactment as nugatory. But they are possible and extreme cases, which will rarely if ever occur. Although the power exist, yet in my opinion it should never be called into action, except in cases of a clear and palpable infringement of the constitution. A frequent resort to it by different public functionaries, would produce such instability and uncertainty in our laws as would be productive of incalculable mischief. Such variant opinions are entertained of different clauses of the constitution and their application, that a statute which one would enforce, another would disregard, and the people would never know what they might rely upon as the law of the land. The Court, therefore, from its respect for the legislature, the immediate representation of that sovereign power whose will created and can at pleasure change the constitution itself, will ever strive to sustain and not annul its expressed determination. And whenever a statute will admit of a construction consistent with the constitution, it is our duty to adopt it, although not the most natural one, *ut res magis valeat quam pereat.* If a part of a statute be at variance with the constitution, it forms no objection to the validity of the residue.

This statute, in reference to its constitutionality, has **more** than ordinary claims upon our favorable regard. It relates to a subject which had frequently received legislative considera- tion and revision before the formation of the constitution. And soon after the adoption of that instrument, it was revised and reënacted by a legislative body, many of whom were members of the convention which formed it ; and who must be presumed to have fully understood its provisions. It can- not therefore be readily believed, that two articles so impor- tant as those guarantying the freedom of conscience and the freedom of the press, should be infringed.

To determine whether the statute impugns either of these provisions, it will be necessary to examine them with care, to ascertain, as far as may be practicable, their true meaning, and then by comparison to ascertain whether there be any incom- patibility between the statutory and the constitutional pro- visions.

The sixteenth article is in these words ; "The liberty of the press is essential to the security of freedom in a state ; it ought not, therefore, to be restrained in this Commonwealth." The first member of the sentence expresses the importance of the object, and the last lays down the rule for its protec- tion. In a fundamental law, like this, the terms used, though only implying obligation or duty, are equivalent to a positive command. And I understand this to be an imperative inter- diction of any restraint upon the liberty of the press, obligato- ry upon every branch of the government.

What is the true import and effect of it ?

Under this prohibitory law the defendant claims for every citizen a right to publish, in any form, by printing or pictures, whatever he pleases, without liability to punishment. No mat- ter how obscene, how profane, how blasphemous, how revolt- ing to the sentiments of the community, how shocking to their notions of decency and decorum a publication may be, no matter what motives may actuate the author, how corrupt, how malicious they may be, it is all protected by the constitution. The judiciary has no power to punish it. The legislature has no power to inhibit it.

The statement of the proposition, carried out to its legiti-

mate extent, with an explanation of the nature and tendency of it, is perhaps its best refutation. It carries self-condemnation on its face.

The legislature have the general power to define and prescribe the punishment for crimes. They may determine what *acts* shall be deemed crimes. And may they not determine what words shall be deemed criminal ? Is liberty of action less important than liberty of speech ? Is personal freedom less sacred than the freedom of the press ? With a single exception, there is no restraint upon the legislature in relation to the punishment of speech. They can punish for *acts* and for *words*, but it is argued that they cannot punish for any thing *printed*. Verbal slander, profanity, obscenity and blasphemy, may be interdicted, but the moment it is put in print it becomes privileged and is above legislative control. Will *printed* falsehood circulate less extensively, or do less injury to individuals or the public, than *oral* ? What good reason can be found in the constitution or in sound principle, why a man should not be answerable for the truth of what he publishes, as well as of what he speaks ?

Could the convention or the people have intended to secure to the freedom of the press so great latitude and such extraordinary immunities ? Will not these extravagant claims greatly tend to endanger this right, which is so truly valuable, and which is regarded with so much favor by the constitution ?

If we examine the history of English jurisprudence in reference to this subject, from the settlement of this country till the formation of its government, and see the nature of the restraints which in England were imposed upon the press, and which were familiar to the minds of the framers of our constitution, we can hardly doubt that they had in view principally, previous restraints ; and that their main object was to prohibit a censorship of the press. But I am not willing to limit the operation of the article to this object alone. I can conceive of other ways in which the press may be improperly restrained and other modes of invading its legitimate rights and liberty, which should fall equally within the constitutional prohibition. Fundamental laws ordained for the restraint of the government as well as the people, and intended to endure

for ages, should be liberally construed and full effect be given to all the words, without regard to extraneous and temporary circumstances. The fair import of the language, as explained by the nature of the subject and the general tenor of the whole instrument, should prevail.

If the convention had intended to prohibit all legislative action upon the subject, they easily *could*, and undoubtedly *would*, have used language clearly indicating such intention. They thought proper to secure to the members of the legislature, while in the exercise of their official duty, not only freedom of speech, but an exemption from liability for the abuse of that freedom. And they accordingly provided, in the twenty-first article, that any thing said in debate "cannot be the foundation of any accusation or prosecution, action, or complaint in any other court or place whatsoever." Now if they had intended to secure the same extent of immunity for the liberty of the press, they would have included it in this article or have applied the same or other equally explicit language to it in the other article. The omission is too important to be imputed to accident, and by a well known rule of construction, is decisive of the point. *Expressio unius exclusio alterius.*

The first article, the corner stone of the constitution, contains the following political expressions : " All men are born free and equal, and have certain natural, essential, and unalienable rights ; among which 'may be reckoned the right of enjoying and defending their lives and liberties ; that of acquiring, possessing and protecting property." The rights of *enjoying* liberty and life, of *acquiring* and *possessing* property, are not less valuable or less deserving of constitutional protection than the liberty of the press ; nor are they guarded by less strong or explicit language ; yet no rational man can suppose that the legislature is restrained from determining, for what *deeds, property, liberty*, and even *life*, shall be forfeited. It cannot for a moment be doubted that the legislature has the general power, in their wisdom and discretion, to determine what *acts* shall be deemed crimes, and to prescribe for them such punishment as they may judge proper, either by *fine*, by *imprisonment*, or by *the taking of life.*

The defendant has fallen into the common error of arguing from the abuse of a power against its existence. This argument carried to its full extent would exclude all delegated authority. For the very existence of power in any branch of government, or 'n any agent, public, or private, necessarily implies a discretion in the depositary, and therefore must be liable to abuse. The only inference which can fairly be drawn from this source, is, that powers peculiarly liable to abuse should be granted with caution and guarded in the best practicable manner. But the notion that the danger of abuse, should prevent the granting of such powers as are necessary to the proper regulation and restraint of civil society, implies a want of confidence in the intelligence and virtue of the people and their selected agents, and is subversive of the fundamental principles of representative government and rational liberty.

The position of the defendant is, that the liberty of the press is so guarded and protected by the sixteenth article, that no law which operates in any degree to restrain a person from publishing whatever he pleases, from bad or good motives, can be reconciled with its prohibition. And yet he is constrained to admit, what no rational man can deny, that a person may be' liable, in a civil suit, for any damages which he may cause to another by a libellous publication. Injuries to feelings, to reputation, and to property, as deep and lasting, may be inflicted by a false and malicious libel, as by any violation of the rights of persons or of property. To provide no redress for such injuries, would be subversive of the principal ends of civil government. To authorize a civil suit for an injury inflicted by the press, would necessarily operate as some restraint upon what the defendant calls the liberty, but what seems to me to be the licentiousness of the press. The power which determines in what form and to what extent a publisher shall be responsible, must, from its nature, be the legislative power.

The above concession admits that libellous publications may be individual wrongs. Every crime is a private injury, as well as a public offence.

" The distinction between public crimes and private injuries," says a learned annotator upon Blackstone, " seems en

*Margin note:* Commonwealth *v.* Kneeland

tirely to be created by positive laws and is referable only to
civil institutions.    Every violation of a moral law or natural
obligation, is an injury for which the offender ought to make
retribution to the individuals who immediately suffer from it,
and is also a crime for which he ought to be punished to that
extent which would  deter both him and others from a repeti-
tion of the offence."  4 Bl. Comm. 59, note.   It is the pecu-
liar province of legislation to  determine what injuries shall be
left to civil suits for redress, and what from  their violence or
their dangerous tendency shall be  deemed  legal offences and
repressed by the terror of punishment  and the sword of the
magistrate.    The object of both is to protect the people in
the possession and enjoyment of their rights and privileges.

I have been led much further in the  discussion of this
branch of the subject than I intended, or than is necessary.
And I will only add, that the constitutions of most of the
States in the Union contain similar provisions ; and yet not
an instance has been referred to or can be found, in which
the construction contended for has been adopted.   But on the
contrary, as far as they have received judicial expositions they
have been in accordance with the above views.

In this State, from the formation of our government to the
present day, libels have ever been  deemed  crimes, and pun-
ished as such, by virtue of a constitutional adoption of the com-
mon law.    If the sixteenth article prohibits the punishment
of them, this long and uniform course of judicial decisions has
been founded in error and a violation of the constitution.   But
we rest not only upon judicial, but legislative authority.    All
branches of the legislature have repeatedly recognised the ex-
istence, and of course the constitutionality of the criminal law
of libel.    Should the Court, against such reasons and such
authority,  declare it void, they would, in  my  opinion, de-
servedly subject themselves to the charge of usurpation and
judicial legislation.    The  law has been enforced for more
than half a century ; and whenever the people become dis-
satisfied with its operation, they have only to will its abro-
gation or modification and let their voice be heard through the
egitimate channel, and it will be done.    But until they wish
it, let no branch of the government, and least of all the judi
ciary, undertake to interfere with it.

On the whole, the true intent and meaning of the sixteenth article seems to me very plain and obvious. While it scrupulously protects the publication of truth, the unrestricted discussion of all subjects sacred or profane, and the dissemination and inculcation of all honest opinions, it contains no restraint upon the legislative power in relation to the punishment of the violations of the rights of others, or of the disturbance of the peace, by malicious falsehoods or obscene or profane publications or exhibitions.

The defendant relies with more confidence and more plausibility upon the last clause of the second article of the Bill of Rights. It is in these words. "No subject shall be hurt, molested, or restrained, in his person, liberty, or estate, for worshipping God, in the manner and season most agreeable to the dictates of his own conscience ; or for his religious professions or sentiments ; provided he doth not disturb the public peace, or obstruct others in their religious worship." The first member of the sentence contains a complete proposition, and secures to every citizen of the Commonwealth perfect liberty of worship, not only as to time and mode, but the more essential parts, the principles and doctrines which he may adopt, profess and inculcate. It embraces all who believe in the existence of God, as well Jews, Mahometans and Deists, as Christians of every denomination. But clearly does not include atheists.

The second proposition contained in this clause may fairly be stated in this connected form. "No subject shall be hurt, molested or restrained in his person, liberty or estate, for his religious professions or sentiments." This clearly protects every citizen, not only in *adopting*, but in *professing*, whatever tenets he may think right ; and necessarily includes the right of *advocating* and *disseminating* them. No restraint, in this respect, is imposed. But every one, in the adoption of his moral principles and the formation of his religious creed, has an unlimited scope, and is left to the free exercise of his own reason and the unbiased dictates of his own conscience.

It is true that the next article, as it originally stood, did not seem to be perfectly consistent with this. It appeared to recognise, not only the Christian religion, but one form of it,

protestant Christianity, as the established religion, which was to be maintained as well as protected by the power of the government ; to the support of which *all* were to be holden to contribute, and upon the ministrations of which *all* were to be compelled to attend. Whether these two articles were reconcilable or not, we have no occasion to inquire. For if the third article ever restrained, or in any way affected, the construction of the second, it has since been abrogated, and the words of the sécond are now left to have their full and unqualified operation and effect.

It has been suggested that this provision does not extend to atheists, because they do not believe in God or religion ; and therefore that their sentiments and professions, whatever they may be, cannot be called *religious* sentiments and professions. But this in my opinion is too narrow a construction. It is true that the term *religious* is very often used in a limited sense, frequently as synonymous with *pious*, and sometimes as denoting devotion to a particular creed or mode of worship. Christians, Jews and Mahometans, Protestants and Catholics, and even different sects of Protestants, reciprocally accuse each other of want of religion. And individuals of every denomination are commonly called *religious* or *irreligious*, according to their characters for piety. If this limited use of the word were to be applied to this important provision, there would be danger that its construction might vary with the varying creeds of its interpreters.

This is a general proposition, which, with other fundamental principles, has been enacted by the sovereign power, into an organic law of the State, for the protection of the rights of the people and the limitation of the powers of the government. Being interwoven in the frame of the government, it was intended to continue in force as long as that should endure. It should therefore receive a liberal construction, unrestrained by the prevailing tenets of any particular time or place. In my judgment, both the spirit and the language of this provision, includes within its protecting power, *all* sentiments and professions *concerning* or *upon the subject* of religion ; and guaranties to every one a perfect right to form and to promulgate such opinions and doctrine upon *religious* matters and *in*

*relation* to the existence, power and providence of a Supreme Being, as to himself shall seem just.   In doing this he acts under an awful responsibility ; but I apprehend it is not to a human tribunal.

Any attempt, by legislation, to control or dictate the belief of individuals, is so impracticable, so perfectly futile, as to show at once, how entirely above all civil authority are the operations of the human mind, especially in the adoption of its religious faith.

The greatest extent to which any government could carry its power would be to compel its subjects to *profess* certain tenets and to prohibit the *profession* of others.   But this would be as impolitic as it is unjust; it would encourage imposture and hypocrisy, but would never promote sincere piety or religion.

These catholic doctrines, though better understood and more fully carried out in other times and countries, find much countenance in the ancient principles of the common law.   A most learned and eminent English judge, never suspected of carrying the principles of liberty, civil or religious, too far, in the case of *Harrison* v. *Evans*, 2 Burn's Eccles. Law, 218, uses the following strong language.   " Conscience is not controllable by human laws, nor amenable to human tribunals. Persecution, or attempts to force conscience, will never produce conviction, and are only calculated to make hypocrites or martyrs.   There never was a single instance, from the Saxon times down to our own, in which a man was ever punished for erroneous opinions concerning rites or modes of worship, but upon some *positive* law.   The common law of England, which is only common reason or usage, knows of no prosecution for mere opinions."   " Nonconformity is no sin at the common law."   See *Harrison* v. *E ans*, 3 Bro. Parl. Cases, 470.

It is to legislative enactments that all the persecutions in the English church are to be traced.   Apostasy, heresy, nonconformity, and all of the class of offences against the established church, are the creatures of express legislation and exist only on the statute book.   4 Bl. Com. *ch. 4.*   It has been supposed that heresy was a crime at common law, and the existence of the writ *de hæretico comburendo*, in the Register, is

considered as proof of it. But Lord Commissioner *White-locke*, in his sensible though quaint argument in *Nayler's* case, 5 Howell's State Trials, 825, refutes this notion. He says this writ was not contained in the ancient manuscript registers, but was of later date and brought in by Archbishop Arundel, in Henry the 4th's time, for the punishment and suppression of the Lollards. And Lord *Mansfield*, in the case just now cited, continues; " What bloodshed and confusion have been occasioned from the reign of Henry 4th, when the first penal statutes were enacted, down to the revolution in this kingdom, by laws made to force conscience. There is nothing certainly more unreasonable, more inconsistent with the rights of human nature, more contrary to the spirit and precepts of the Christian religion, more iniquitous and unjust, more impolitic, than persecution. It is against natural religion, revealed religion and sound policy."

To allow and encourage discourses and arguments in proof of the existence of the Deity and in support of the Christian religion, and to prohibit arguments on the other side, would appear to imply a want of confidence in the truth, power and efficacy of those great doctrines, which would give advantage to their opponents, and, instead of aiding and supporting them, would lead to skepticism and infidelity. These essential and all important truths are too deeply rooted and have too strong a foundation, to need or admit of the fallacious and dangerous aid of human legislation.

Upon the fullest examination which I have been able to give the two articles under consideration, I can entertain no doubt of their true import and meaning. They perfectly harmonize with each other. And taken together, they guaranty to every citizen the right to form, enjoy and promulgate such opinions, upon any subject, as his own judgment shall dictate. They inhibit the legislature from making any law which shall infringe this right. It is their duty to protect it, to secure the enjoyment of it, and to guard it from abuse. And for this purpose they may pass laws to punish those who, under the pretence of exercising it, shall wantonly and wickedly invade the enjoyment of it by others. It cannot be necessary to the fullest enjoyment of this right by any one, that he should

wound the feelings or shock the sense of decency of others, by obscene or profane language or publications, or endanger the peace of society by malicious falsehoods.

The legal axiom so often applied to property, is equally applicable to these more important personal rights. *Sic utere tuo ut alienum non lœdas.* Let each man so use his own freedom, so enjoy his own faith, and so advocate his own doctrines, as not to interrupt the full enjoyment of the same rights by others. It cannot be necessary or expedient that any man, in the inculcation of his own notions, should abuse or insult others. And I have no doubt that a law punishing malicious falsehoods or obscene, profane or blasphemous language, used with the malicious intent to injure others, is constitutional.

The criminality in these as in all other cases, must be made to depend upon the motive. There can be no crime in law without a criminal intent. And this gives a broad and plain boundary between the real freedom of conscience, of discussion and of the press, and the abuse of it by wanton and malicious attacks upon the rights and privileges of other individuals, or of the community. If the object be to communicate facts, to discuss subjects with a view to ascertain the truth, or to disseminate opinions honestly entertained, then it is a legitimate exercise of the freedom of speech or of the press. And in such cases great latitude of argument, illustration and language would be allowed. But if the object be to calumniate, or wantonly or maliciously to cause pain or injury to others, by wounding their feelings or corrupting their principles, then it is an abuse of that freedom and the proper subject of criminal legislation. The question of malice is always a question for the jury. And I can perceive no greater danger in leaving this question to the integrity and intelligence of a jury in these cases, than in cases of homicide, and other felonies and high crimes.

I have endeavoured to confine this discussion thus far entirely to the constitutional question. In regard to the expediency of exercising the power, to the wisdom of legislating upon the subject of libel, profanity or blasphemy, it is not my province to judge. Although I may have formed a decided opinion, yet it would be unbecoming my situation to

express it on this occasion.   We are bound to presume that it will never be exercised except on proper occasions, and when exercised will be wisely used by the department to which it is intrusted.

The power to legislate on this subject is not without its limits.  The legislature may not, under the name of blasphemy, punish acts which are protected by the constitution.   And a material inquiry in this case is, whether the legislature have in this respect transcended their duty.

The statute enacts, that " *if any person shall wilfully blas pheme the holy name of God, by denying, cursing, or contu-meliously reproaching God,*" &c.   The Attorney General contends that one mode of committing the offence is, by denying the existence of God.    And that a *denial* is of itself blasphemy.    The language certainly will admit of this con-struction.    And his argument in favor of it, derived from the omission of the word " *denying* " in the next clause, as appli-cable to Jesus Christ and the Holy Ghost, is certainly entitled to consideration.  Indeed I feel bound to admit that this seems to me to be the most natural and obvious construction.

But if this be the true meaning of the statute, I am by the course of my former reasoning brought to the conclusion, that it is irreconcilable with the constitution.    What one man may assert, another may deny.   No one may advocate an opinion which another may not controvert.    The Provincial statutes made it blasphemy to deny the divinity of Jesus Christ, or the doctrine of the Trinity.   And I cannot perceive why the legislature have not the same constitutional power to punish such a denial, that they have a denial of God.   We all, I presume, should resist such an exercise of power, not only on the ground of expediency, but of constitutionality.

But I think a further examination of the statute will satisfy us, that this objection may be obviated.   If it will admit of two constructions, the one of which is consistent and the other inconsistent with the constitution, there can be no doubt which should be adopted.   Although the statute clearly indicates that one mode of blaspheming may be by denying God ; yet I am not willing to believe that it was ntended to denominate the *mere denial* of itself blasphemy.   Atheists might be placed

in situations in which it would be their duty to declare their opinions on this point.   A witness, on the stand, would be liable to punishment if he refused to answer questions as to his belief in God.   It must at least be a voluntary denial. But this is not enough.   For a man has a right to avow and promulgate his belief and to support it in the best manner he is able.   To complete this offence, in my judgment, there must be not only a *denial* of God, but it must be done in a manner and in language justly offensive to others and attended by a corrupt and malicious intent ; in other words, it must be *blasphemously* done.

That this is the proper construction to be put upon the statute, I think will appear very clearly by an examination of the true meaning and import of the term blasphemy, in com mon acceptation as well as in legal language.

The common standard writers on criminal law, give but little precise information on the subject.   Those who mention it at all, generally denounce it as a high crime, but give no accurate description of it.   Collyer defines it to be " profane-ness against the general principles of religion and morality." Collyer on Crim. Stat. 28, note.   Blackstone, one of the most accurate writers on law, says, " one of the offences more immediately against God and religion, is that of blas-phemy against the Almighty, by denying his being or provi-dence, or by contumelious reproaches of our Saviour Christ." Hale, Hawkins, Bacon, and others, use similar language.   I confess I have not been able to draw from this source a very precise and satisfactory notion of this crime.   I have turned to common lexicographers and other writers, with, as I think, a little better success.

Webster defines *blasphemy* to be " An indignity offered to God by words or writing ; reproachful, contemptuous or ir-reverent words uttered impiously against Jehovah."   " *To blaspheme*, to speak of the Supreme Being in terms of im-pious irreverence ; to revile or speak reproachfully of God, or the Holy Spirit."   Other standard English dictionaries contain substantially the same definition.

In the Universal Latin Lexicon, of Facciolatus and For-cellinus, by Bailey, *Blasphemia* is defined, " reviling words,

vile reproachful language, (properly, uttered against the De
ity,)" " convicium, obtrectatio, dictum lædens famam."

*Schleusner*, in his Lexicon of the New Testament, says,
" *Blasphemia* significat obtrectationem, calumniam, maledi
centiam."

The civil lawyers attach substantially the same meaning to
the word.

Voet thus describes it, " In Deum blasphemia, qua .in
Deo pugnantia cum ejus natura et sanctitate, cum contemptu,
et velut in contumeliam ejus, proferuntur." Comm. ad Pand.
*lib.* 48. *tit.* 4. *no.* 1. And Clarus says, " Blasphemia est
omne convitium, contumelia vel maledictum in Dei nomen
prolatum."

We can derive no aid from the etymology of the word ;
nor are we in any danger of being misled by it  It cannot be
said to be derived from the Greek ; for it is an original Greek
word adopted into the Latin and English languages with no
alteration, unless a slight change of the termination may be
called one.

Doctor Campbell, in his able and excellent work upon the
Four Gospels, gives a learned and sensible explanation of the
subject. The original word *blasphemia*, he says, denotes
*calumny, detraction, reproachful or abusive language.* *Vol.* ii.
*p.* 77. Again he says, (*p.* 79,) it " comprehends all sorts
of *verbal abuse, imprecation, reviling and calumny.*" By
referring to the numerous passages in the New Testament
where this word and its conjugates are used, it is very appa-
rent that it was not aimed exclusively against God, but was
used with reference to angels, to Moses, and to other men.
And in the 9th verse of the Epistle of Jude, it is applied
directly to the devil. In the more modern application of the
word to the Deity and to religion, it retains much of its
original meaning. It carries along with it the former quality
of a calumnious, reviling intent. By a review of all the above
definitions and descriptions of blasphemy, it will be seen that
a wicked disposition of mind and a malicious motive, rather
than the avowal of opinions, characterize the crime. It con-
sists in the wicked and malicious purpose of injuring and
molesting others, rather than the dissemination of erroneous

doctrines. It cannot be committed by advocating or denying
any opinions, or in the full and free discussion of any subject, unless it be done with a malicious motive, and in a manner which inflicts injuries on others.

The legal authorities too, if fairly examined, will, I think, give some support to the same view. Even where the general doctrine appears to make blasphemy consist in a profession of atheism, it will commonly be found to be qualified by the existence of a wicked intent. The law in this respect is well stated and explained by Hume, an able Scotch writer upon criminal law. 1 Hume on Crim. Law, 559. He says, "blasphemy, or as some of the foreign doctors, with more fancy than propriety, have termed it, the crime of treason or læse majesty against God, consists in the denial of his being, attributes or nature, or in the uttering of impious and profane things against God, or the authority of the holy Scriptures. According to the same lawyers, who may here appeal to the acceptation of the term in common language, blasphemy is only committed by the uttering of such things, when it is done in a scoffing and railing manner ; out of a reproachful disposition in the speaker, and, as it were, with passion against the Almighty, rather than with any purpose of propagating the irreverent opinion. The like sentiments uttered dispassionately or conveyed in any calm or advised form, are rather a heresy or an apostasy than a proper blasphemy." The distinction is here clearly shown between reproachful abuse or malicious scoffing, which may be called blasphemy, and the propagation of erroneous or heretical doctrines.

Lord Commissioner *Whitlocke*, in the case before cited, says, " Heresy is *crimen judicii*, an erroneous opinion." Blasphemy is " *crimen malitiæ*, a reviling the name and honor of God." And Chief Justice *Kent*, in an able opinion in the case of *The People* v. *Ruggles*, holds substantially the same doctrine. He says, that " blasphemy, according to the most precise definitions, consists in maliciously reviling God or religion." Again, he says, " the free, equal, and undisturbed enjoyment of religious opinion, whatever it may be, and free and decent discussions on any religious subject, is granted and secured ; but to revile, with malicious and blasphemous con-

tempt, the religion professed by almost the whole community, is an abuse of that right."

From these citations and references, I think, is clearly to be deduced the doctrine, that this crime does not consist in the discussion of any subject, in the propagation of any sentiments, or in the denial of any position, but in the wicked and injurious intent with which it is done. And, in my opinion, this intent must have reference to other men and consist in a malicious purpose to infringe their rights, to destroy their peace of mind, or to disturb the good order of society. I must, in candor, admit that none of these authorities come fully up to what seems to me to be the true definition of legal blasphemy I wish to superadd one ingredient, which, though not clearly excluded, yet does not seem to be distinctly included in either of them. Notwithstanding the remarks contained in several of the above citations, I cannot think that any state of mind or temper in reference to God or religion, goes to make up this legal offence. Anger towards God, indignity to him, to our Saviour, or the Holy Ghost, a disposition to scoff at religion, do not seem to me to be the subjects of human punishment. These sins may be committed when no one is present, and be known to God alone ; and cannot be reached by a human tribunal. But if made known, they would not be the subject of punishment, because they inflicted no injury upon any human being, and so did not violate the rights of society. It is only the injury to civil society which can give civil government jurisdiction of them.

For a man's private opinions, for his communion with his creator, for his devotional feelings and exercises, he is answerable to his God alone. When he engages in the discussion of any subject in the honest pursuit of truth, and endeavours to propagate any notions and opinions which he sincerely entertains, he is covered by the ægis of the constitution ; but when he wantonly or maliciously assails the rights and privileges of others, or disturbs the public peace, he is the proper subject of punishment.

Applying these doctrines to the statute under consideration, and construing it with reference to the constitution, I have come to the conclusion, that it was not intended to punish a

denial of the existence of God ; but only such denial when
made in a manner calculated to give just offence to others,
and with a bad intent.   With this interpretation the statute is
in harmony with the constitution.    Whether my learned .
brethren fully agree with me in my views of the statute or not,
I am happy in being able to give to it such an interpretation
as will enable me to concur with them in sustaining its consti-
tutionality and in overruling the defendant's motion in arrest
of judgment.   Perhaps it is not to be regretted that we have
taken somewhat different views of the subject, inasmuch as
they have brought us to the same conclusion.

This protracted discussion has in some measure prepared
us to dispose of the remaining questions, which arise upon the
instructions to the jury.   These instructions consisted in an
explanation of the meaning of the defendant's language, alleged
to be blasphemous, and a legal position laid down in reference
to it.   The paragraph mainly, if not exclusively, relied upon
on the part of the government, both in the trial before the jury
and in the argument before the Court, is in these words ;
" Universalists believe in a god which I do not ; but believe
that their god, with all his moral attributes (aside from nature
itself) is nothing more than a chimera of their own imagina-
tion," &c. &c.   I agree with my learned brethren, that the
charge put the true construction upon this language.   A
declaration of a disbelief in the being of a God, whatever
form of expression may be resorted to for the purpose of
making it known, is a denial.   The criticism of the defendant
on his own language seems to me to be more ingenious and
specious than sound.   If this clause be ambiguous, yet a ref-
erence to other remarks in the same paper and especially to
his professed creed, would clearly show that he intended to
avow a disbelief in the existence of that intelligent, benevolent,
eternal, allwise and almighty Being, whose government com
prehends the universe, whose wise providence is over all his
works, and who is designated in the statute by the word
*God.*

Having fixed the construction of the paragraph, the presid-
ing justice further " *instructed the jury, that the wilful denial
of the existence of any God, would be a violation of the statute.*'

Common-
wealth
*v.*
Kneeland.

I regret that I cannot concur with my learned brethren in the correctness of this instruction. It seems to me that this language would convey to the minds of the jury the impression, that their inquiry need not go beyond the question, whether the defendant voluntarily denied the existence of a God. If I have had any success in my attempt to discuss this subject, I have shown that a man may make such denial, and yet not be guilty of any indictable offence. The jury might well have understood that their duty did not require them to pass upon the question of malice or corrupt intent.

Every person has a constitutional right to discuss the subject of a God, and to affirm or deny his existence. I cannot agree that a man may be punished for *wilfully* doing what he has a legal right to do. *Wilfully* sometimes means *intentionally, by design, with set purpose.* In either of these senses it certainly imports no crime. How can it be known that the jury did not so understand it ? It would not be an unnatural construction. If so, their minds have not acted upon and they have not found one of the elements of the crime imputed to the defendant. Inasmuch as the construction of the paragraph was a subject of comment, and as it was relied upon as the principal evidence in support of the indictment, it is somewhat probable that the minds of the jurors were drawn to this view of the case. And I feel constrained to say, that if this paragraph were the only proof of the defendant's guilt, it would be extremely difficult to support the indictment. I cannot perceive in this language any conclusive evidence of blasphemy.

Emlyn's preface to the State Trials contains some sensible remarks so pertinent to this part of the case, and so applicable to the whole subject, that I cannot forbear to insert them. He says, " in the case of a blasphemous libel it is customary to insert the words *falso et malitiose scripsit*, &c., and indeed they are the very gist of the indictment, and absolutely necessary to constitute the offence ; for as no words can be blasphemy (*i. e.* a reproachful reflection) on God or religion which are true, for truth can be no reflection on the God of truth ; so no opinion, however erroneous, can merit that denomination, unless uttered with a wicked, malicious design

of reviling God or religion. And yet how often have persons been found guilty without any proof either of the falsehood of the positions, or of the malice of him who wrote them. These are things not always sufficiently attended to by juries. It often satisfies them if the defendant be proved to have done the fact (i. e. wrote the book), whether with the circumstances *falso et malitiose* or not. And yet when the defendant comes to move in arrest of judgment, that what he has done cannot amount to blasphemy, because it was not done with an evil intent, he is told that that is found by the verdict and must be taken to be true.

But I do not rest my opinion upon any supposed misapprehension of the jury or any liability in the language of the charge to mislead. I think the instruction upon any admissible interpretation of the language, is incorrect in principle. The position laid down is, that a *wilful* denial of the existence of a God is blasphemy. This cannot be maintained without giving to the term *wilful* an unnatural and extraordinary import. It must have superadded to its usual signification, that of a word dissimilar and foreign from it, and made equivalent to *wilful* and *blasphemous*.

*Wilful*, in its worst sense, is defined by the synonymes, *obstinate, stubborn, without yielding to reason, inflexible, perverse*. If either of these meanings be adopted, I cannot think that they will give to the denial the qualities necessary to constitute blasphemy. A voluntary denial does not amount to the offence. And it must be remembered, that in making the denial the defendant might be in the exercise of a legal right. And in my opinion, to exercise a right to assert or deny any thing *obstinately, stubbornly, unreasonably, inflexibly* or even *perversely*, will not necessarily convert it into a crime. To constitute a crime, there must be an infringement of the rights of others and a malicious purpose. To make *wilful* imply both a wrong and malice, is to give to it a force and effect beyond what it will bear or what can be maintained, either in ts common acceptation or its legal import.

It has been argued, that the charge adopted very nearly the words of the statute. This may be true, and yet a slight change of phraseology, an insertion or omission of a single

Common-
wealth
·v.
Kneeland.
word, may most materially change the meaning. Had the lan
guage of the charge been a *wilful* and *blasphemous* denial, it
would have introduced a new and most important element, and
been equivalent to the words of the statute, "*shall wilfully
blaspheme by denying;*" which, as I have endeavored to show,
import *crimen malitiæ*.

On the whole, I am of opinion that the instruction to the
jury is incorrect, that the defendant has been tried upon a
mistaken view of the law, and for this cause is entitled to
a new trial. This conviction rests very strongly upon my
mind. And but for the respect which I have for the judg·
ment of my learned brethren, I could entertain no doubt
of it.

I have endeavoured to confine myself to the questions of law
before us ; and to examine them upon their legal merits, un-
influenced by any opinions which I may entertain of the na-
ture or tendency of the doctrines advocated by the defendant.
I must not however be understood to express an opinion, that
the whole matter contained in the paper referred to in the
indictment, if properly laid before the jury, would not have
supported their finding, or that there is any sufficient reason
for setting aside the verdict, other than what arises from the
exception to the charge.

*Per Curiam.* The motion in arrest of judgment, and the
exceptions, are overruled, and judgment is to be entered on
the verdict.

*Note.* The defendant was sentenced to sixty days' impris-
onment in the common jail.