**FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

_____

No. 23-11270

_____

ALAN M. DERSHOWITZ,

*Plaintiff-Appellant,*

*versus*

CABLE NEWS NETWORK, INC.,

*Defendant-Appellee.*

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 0:20-cv-61872-AHS

_____

Before GRANT, LAGOA, and WILSON, Circuit Judges.

GRANT, Circuit Judge:

While representing President Donald J. Trump in impeachment proceedings before the Senate, law professor Alan Dershowitz gave a statement about the scope of impeachable offenses. That statement proved controversial, with many

reporters and commentators characterizing it as out of bounds. Dershowitz now claims that CNN in particular, along with its on-air personalities, defamed him—intentionally misrepresenting his comments to tarnish his reputation.

For a public figure like Dershowitz to prevail, defamation law has long required proof of a speaker's actual malice: knowledge of or reckless disregard for the falsity of a statement. But here, the available evidence points to the reporters' sincere—if mistaken or even overwrought—belief in the truth of their accusations. Dershowitz has presented no evidence that shows otherwise. We therefore affirm the district court's order granting summary judgment to CNN.

## I.

Alan Dershowitz is a well-known professor emeritus at Harvard Law School. He is also a practicing criminal defense lawyer who made a name for himself representing prominent figures in some of the most infamous criminal trials in recent memory—O.J. Simpson and Jeffrey Epstein to name two. As Dershowitz admits, he has welcomed the notoriety that has followed.

The dispute here arises out of his representation of another household name—President Donald Trump. Dershowitz represented Trump in January 2020 during his first impeachment trial. In that role he spoke twice on the Senate floor, first giving an opening statement on January 27 and then returning for questions two days later.

Dershowitz's response to one of those questions sparked this dispute. Senator Ted Cruz asked: "As a matter of law, does it matter if there was a quid pro quo? Is it true that quid pro quos are often used in foreign policy?" Selections from Dershowitz's remarks are excerpted below, with the entirety in the Appendix.

> The only thing that would make a quid pro quo unlawful is if the quo were in some way illegal.

> Now, we talked about motive. There are three possible motives that a political figure can have . . . the second is in his own political interest . . . . I want to focus on the second one for just one moment.

> Every public official whom I know believes that his election is in the public interest. Mostly, you are right. Your election is in the public interest. If a President does something which he believes will help him get elected—in the public interest—that cannot be the kind of quid pro quo that results in impeachment. . . .

> [I]t cannot be a corrupt motive if you have a mixed motive that partially involves the national interest, partially involves electoral, and does not involve personal pecuniary interest. . . .

> [A] complex middle case is: I want to be elected. I think I am a great President. I think I am the greatest President there ever was, and if I am not elected, the

4                     Opinion of the Court                    23-11270

national interest will suffer greatly.  That cannot be [an impeachable offense].

A swift reaction followed in the news and on social media. Just moments after Dershowitz's remarks, the Washington Post's live-blog coverage of the impeachment trial featured a bracing headline: "Dershowitz argues that a president is immune if he views his reelection as in the public interest."  Many Twitter users reacted strongly as well.[1]  One was Joe Lockhart, a CNN contributor, who posted that Dershowitz's argument was "crazy" and "corrupt."  Paul Begala, an opinion columnist at CNN, had a similar reaction, tweeting that Dershowitz's statement was "[a]kin to Nixon telling David Frost, 'If the President does it, it isn't illegal.' Only this time it's 'If the President thinks it will help his re-election, and he thinks his re-elections [sic] helps the country, it isn't illegal.'"[2]

As for CNN itself, reporting about Dershowitz's statement began about twenty minutes after it took place, when a newsletter was sent out with a headline reading "Dershowitz argues that

---

[1] Since this suit began, Twitter has merged into X Corp. and the platform now goes by the name "X."  Because the platform was still Twitter when these events took place, we will proceed with that name.  *See Murthy v. Missouri*, 144 S. Ct. 1972, 1982 n.1 (2024).

[2] Quotations contained in the parties' filings have sometimes included minor and nonmaterial alterations to the content of the original sources.  Here and throughout, we have directly quoted the sources underlying the claims in this case.

reelection of any politician is in the national interest, therefore as a motivation can't be impeachable." Within half an hour, a different headline was published on CNN's website: "Alan Dershowitz argues presidential quid pro quos aimed at reelection are not impeachable."

That night and through the next morning, several of CNN's broadcasts and publications criticized Dershowitz and his statement. The critics included Anderson Cooper, who on his online show "Anderson Cooper Full Circle" said of Dershowitz's statement:

> He's essentially saying any politician, because it's so important that they get elected . . . that they decide that it's really important for everybody that they are elected, umm, they can do essentially whatever they want in order to get elected because it's somehow in the public interest.

And Begala wrote that "[t]he Dershowitz Doctrine would make presidents immune from every criminal act." The Appendix includes other examples—criticism of Dershowitz's comments was widespread at CNN.

Elsewhere too: Business Insider published an article titled "Trump lawyer Alan Dershowitz argues Trump can do whatever he wants to get reelected if he believes another term is in the public interest." MSNBC published a blog post titled "Dershowitz shocks with argument about Trump, political interests," in which the author called his statement "crazypants bonkers." And so on.

6                    Opinion of the Court                    23-11270

Dershowitz, unsurprisingly, was displeased with the coverage. After he complained on Twitter that the media had mischaracterized and distorted his statements, CNN allowed him to go on air twice to explain his position. He participated in interviews with CNN anchors Wolf Blitzer and Chris Cuomo on January 30 and 31, respectively.

Unsatisfied, Dershowitz sued CNN for defamation, alleging that the network had intentionally omitted key parts of his statement and perpetrated "a deliberate scheme to defraud its own audience" at his expense. The district court granted CNN's motion for summary judgment, reasoning that Dershowitz could not establish that CNN had acted with actual malice.

## II.

This Court reviews the district court's grant of summary judgment de novo, drawing "all reasonable inferences in the light most favorable to the nonmoving party." *Walker v. Life Ins. Co. of N. Am.*, 59 F.4th 1176, 1185 (11th Cir. 2023) (quotation omitted). In defamation cases like this one, "the appropriate summary judgment question will be whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255–56 (1986).

## III.

Florida law, which we apply here, requires five elements for a defamation claim: (1) publication; (2) falsity; (3) "knowledge or

reckless disregard as to the falsity on a matter concerning a public official"; (4) actual damages; and (5) defamatory content. *Turner v. Wells*, 879 F.3d 1254, 1262 (11th Cir. 2018).

The third element resolves this case. The concept of actual malice was incorporated into constitutional law in *New York Times Co. v. Sullivan*, where the Supreme Court considered First Amendment limits on state-tort defamation liability for public officials. 376 U.S. 254, 256, 279–80 (1964). Public figures, the Court said, cannot recover damages for defamation unless they prove that an untrue statement was made "with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* at 279–80. That is, "actual malice." *Id.* at 280. Florida has since implemented that same standard as a matter of state law. *See Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008).

A showing of actual malice requires "sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication," or that he "acted with a high degree of awareness of probable falsity." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968); *Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 510 (1991) (alteration adopted and quotation omitted). "Mere negligence" is not enough. *Masson*, 501 U.S. at 510. Instead, the speaker's conduct must rise to the level of recklessness. Nor should actual malice be confused with "evil intent or a motive arising from spite or ill will." *Id.* Speakers' feelings about their subjects are irrelevant—all that matters are the

8                        Opinion of the Court                    23-11270

speakers' subjective beliefs about the truth of their own statements. *Turner*, 879 F.3d at 1273.

Dershowitz, who no one disputes is a public figure, has presented no evidence that CNN's commentators or producers acted with actual malice. To begin, CNN has offered unrefuted evidence that its commentators believed in the truth of their statements about Dershowitz; all of the journalists testified that they believed their statements were fair and accurate. And Dershowitz did not counter that evidence. Instead, he repeated a boilerplate objection that the testimony was "scripted and self-serving." Probably so. But that does not render it non-probative, and in the absence of contrary evidence, questioning the witnesses' credibility is not enough to create a factual dispute. *See Penley v. Eslinger*, 605 F.3d 843, 853 (11th Cir. 2010).

Dershowitz next points to a series of internal emails and phone calls at CNN, arguing that these show the network and its commentators collaborating to deceive their viewers and damage his reputation. For one, right after Dershowitz's statement a CNN correspondent emailed then–CNN President Jeff Zucker that Dershowitz had "gone crazy." "Yup," Zucker replied, "Him and Lindsay [sic] Graham." And later that afternoon, Zucker held a conference call with several producers, executives, and "news gatherers." One producer summarized that "very brief" meeting's takeaway as "Trump legal team making argument that a President is King & can do whatever he wants." Another producer echoed that characterization.

23-11270                 Opinion of the Court                          9

These communications suggest not conspiracy but sincerity, however misplaced. To start, it appears that none of the commentators who Dershowitz says defamed him participated in Zucker's conference call. And though Dershowitz argues that the emails reveal "marching orders about how the story should be spun," the emails themselves do not support that contention; they contain characterizations of Dershowitz's remarks, but no directives or orders. If anything, the communications tend to support CNN's position that the relevant speakers believed in the truth of their reporting.

What's more, the commentators all testified that they reached their conclusions about the newsworthiness and interpretation of Dershowitz's statement independently of any direction from Zucker or other leaders at CNN. Again, Dershowitz disputes this testimony as "scripted and self-serving," but without any evidence his objection cannot move the needle. And at least two commentators—Joe Lockhart and Paul Begala—tweeted critically about Dershowitz's statement while he was still speaking or shortly after he concluded, refuting any contention that their opinions were formed a few hours later at Zucker's direction.

Dershowitz also contends that the similarity between the reporting of CNN's commentators is evidence that they "colluded with each other and CNN staff to smear Dershowitz, whom they all hated for sticking to his principles and defending Trump." Dershowitz's assessment of the CNN commentators' feelings about him may well be accurate—but it is also irrelevant. As we

have explained, the question is not whether they disliked Dershowitz, Trump, or both; it is whether they knew their statements were false. *See Masson*, 501 U.S. at 510. Again, all of the commentators testified that they believed their statements were true, and Dershowitz offers no evidence to contradict that testimony. The fact that the CNN commentators all presented similar interpretations of Dershowitz's statements (as did many other news outlets at the time) speaks to ideological lockstep, not deliberate misrepresentation. Groupthink, however unwelcome, is not the same thing as actual malice.

In a final effort, Dershowitz points to two out-of-circuit cases that he says are highly analogous, but neither comparison holds water. The first is *Schiavone Construction Co. v. Time, Inc.*, in which the Third Circuit concluded that a magazine's decision to deliberately ignore exculpatory evidence was enough to show actual malice. 847 F.2d 1069, 1092 (3d Cir. 1988). Dershowitz contends that his case is just like *Schiavone*—stronger, even—because CNN "omitted key portions of what [he] said to make it sound like he said the precise opposite." But that's not so. CNN aired the full video of Dershowitz's comments, and also invited him on air (multiple times) to clarify his position. And unlike *Schiavone*, we see no evidence here that the network intentionally hid information that would have proven the challenged claims untrue.

The second case Dershowitz offers is *Goldwater v. Ginzburg*, 414 F.2d 324 (2d Cir. 1969). There, the authors of an article about

23-11270                Opinion of the Court                11

Senator Barry Goldwater had predetermined their message: "Goldwater is so belligerent, suspicious, hot-tempered, and rigid because he has deep-seated doubts about his masculinity." *Id.* at 329. As research progressed, the authors ignored materials except those that were derogatory of Goldwater—even when complimentary statements expressly qualified the derogatory ones. *Id.* The authors also conducted a sham poll of psychiatrists, the result of which—of course—was highly critical of Goldwater. *Id.* at 329–32. The Second Circuit upheld a jury verdict in favor of Goldwater's defamation claim. *Id.* at 328. Dershowitz, unlike Goldwater, has offered no extrinsic evidence to show that the commentators at CNN acted without regard for the truth of their statements with the express purpose of destroying his reputation. Nor has he shown that leaders at CNN instructed them to report in a particular way as part of a scheme against him.

A better comparator than the ones Dershowitz proposes is this Court's recent decision in *Project Veritas v. Cable News Network, Inc.*, 121 F.4th 1267 (11th Cir. 2024). Anchors for CNN (also the defendant there) incorrectly reported that an investigative journalistic organization had been suspended from Twitter for spreading *mis*information when the real violation was that it had allegedly posted *private* information.[3] *Id.* at 1271–79, 1283–84. But there, unlike here, the plaintiff offered ample evidence of actual

---

[3] That, too, was flimsy because the "private information" was a house number in the background of a video. *Project Veritas*, 121 F.4th at 1272, 1283.

malice, showing that the anchors had plenty of reasons to doubt what they reported. *Id.* at 1283–84.

To start, four days earlier, an article published on CNN's website had discussed the true cause for the suspension. *Id.* at 1272, 1283–84. And one CNN anchor who later echoed the misinformation claim had already reported that sharing of private information led to the suspension. *Id.* By relying on these contradictions in its complaint, the plaintiff had "shouldered its heavy burden" of alleging actual malice. *Id.* at 1283 (alteration adopted and quotation omitted). Here, in contrast, Dershowitz has offered no contradiction or other evidence that CNN's commentators doubted the truth of what they reported.

⋆    ⋆    ⋆

In his zealous and highly scrutinized representation, Dershowitz made a spontaneous series of remarks before Congress that, he says, were misinterpreted by pundits. But even if those commentators did report incorrectly on Dershowitz's statements, he has offered no evidence that they did so intentionally. If anything, the evidence shows that they believed in the truth of their reporting, and that they formed their opinions independently. Without evidence of actual malice Dershowitz's defamation claim cannot go forward, so we **AFFIRM** the district court's grant of summary judgment to CNN.

23-11270                  Opinion of the Court                        13

## Appendix

*Dershowitz Statement:*

> Yesterday, I had the privilege of attending the rolling-out of a peace plan by the President of the United States regarding the Israel-Palestine conflict, and I offered you a hypothetical the other day: What if a Democratic President were to be elected and Congress were to authorize much money to either Israel or the Palestinians and the Democratic President were to say to Israel "No; I am going to withhold this money unless you stop all settlement growth" or to the Palestinians "I will withhold the money Congress authorized to you unless you stop paying terrorists,["] and the President said "Quid pro quo. If you don't do it, you don't get the money. If you do it, you get the money"? There is no one in this Chamber who would regard that as in any way unlawful. The only thing that would make a quid pro quo unlawful is if the quo were in some way illegal.

> Now, we talked about motive. There are three possible motives that a political figure can have: One, a motive in the public interest, and the Israel argument would be in the public interest; the second is in his own political interest; and the third, which hasn't been mentioned, would be in his own financial interest, his own pure financial interest, just putting money in the bank. I want to focus on the second one for just one moment.

Every public official whom I know believes that his election is in the public interest. Mostly, you are right. Your election is in the public interest. If a President does something which he believes will help him get elected—in the public interest—that cannot be the kind of quid pro quo that results in impeachment.

I quoted President Lincoln, when President Lincoln told General Sherman to let the troops go to Indiana so that they could vote for the Republican Party. Let's assume the President was running at that point and it was in his electoral interests to have these soldiers put at risk the lives of many, many other soldiers who would be left without their company. Would that be an unlawful quid pro quo? No, because the President, A, believed it was in the national interest, but B, he believed that his own election was essential to victory in the Civil War. Every President believes that. That is why it is so dangerous to try to psychoanalyze the President, to try to get into the intricacies of the human mind.

Everybody has mixed motives, and for there to be a constitutional impeachment based on mixed motives would permit almost any President to be impeached.

How many Presidents have made foreign policy decisions after checking with their political advisers and their pollsters? If you are just acting in the national interest, why do you need pollsters? Why do you need political advisers? Just do what is best for the country. But if you want to balance what is in the

public interest with what is in your party's electoral interest and your own electoral interest, it is impossible to discern how much weight is given to one or the other.

Now, we may argue that it is not in the national interest for a particular President to get reelected or for a particular Senator or Member of Congress—and maybe we are right; it is not in the national interest for everybody who is running to be elected—but for it to be impeachable, you would have to discern that he or she made a decision solely on the basis of, as the House managers put it, corrupt motives, and it cannot be a corrupt motive if you have a mixed motive that partially involves the national interest, partially involves electoral, and does not involve personal pecuniary interest.

The House managers do not allege that this decision, this quid pro quo, as they call it—and the question is based on the hypothesis there was a quid pro quo. I am not attacking the facts. They never allege that it was based on pure financial reasons. It would be a much harder case.

If a hypothetical President of the United States said to a hypothetical leader of a foreign country: Unless you build a hotel with my name on it and unless you give me a million-dollar kickback, I will withhold the funds. That is an easy case. That is purely corrupt and in the purely private interest.

> But a complex middle case is: I want to be elected. I think I am a great President. I think I am the greatest President there ever was, and if I am not elected, the national interest will suffer greatly. That cannot be [an impeachable offense].

166 Cong. Rec. S650–51 (daily ed. Jan. 29, 2020) (statement of Alan Dershowitz).

23-11270                 Opinion of the Court                    17

*CNN Commentary:*

> He's essentially saying any politician, because it's so important that they get elected . . . that they decide that it's really important for everybody that they are elected, umm, they can do essentially whatever they want in order to get elected because it's somehow in the public interest.

Anderson Cooper, *Anderson Cooper Full Circle* (CNN online broadcast, aired Jan. 29, 2020, at 6:34 p.m.).

> This view of the executive, the executive power that Dershowitz basically announced today, would make the President a king. It would put the President beyond the rule of law, and . . . you and I are talking about a quid pro quo here of exchanging, withholding military aid, but we could think of a lot of other things that there's no version, you know, could you kill your opponent? Could you, you know, leak dirt on someone? There's countless[—]there's no limit to basically how badly behaved people could be, and they could actually commit crimes which we know, you know, Dershowitz is essentially saying it doesn't matter what the quid pro quo is as long as you think you should be elected.

Anne Milgram, *Anderson Cooper Full Circle* (CNN online broadcast, aired Jan. 29, 2020, at 6:35 p.m.).

> Having worked in about a dozen campaigns, there is always the sense that, boy, if we win, it's better for the country. But that doesn't give you license to commit crimes or to do things that are unethical. So, it was absurd. And what I thought when I was watching was this is un-American. This is what you hear from Stalin. This is what you hear from Mussolini, what you hear from authori—, from Hitler, from all the authoritarian people who rationalized, uhh you know, in some cases genocide, based on what was in the public interest.

Joe Lockhart, *Erin Burnett OutFront* (CNN television broadcast, aired Jan. 29, 2020, at 7:11 p.m.).

> I did not go to Harvard Law, but I did go to the University of Texas School of Law, where I studied criminal law and constitutional law, but never dreamed a legendary legal mind would set them both ablaze on the Senate floor.

> The Dershowitz Doctrine would make presidents immune from every criminal act, so long as they could plausibly claim they did it to boost their re-election effort. Campaign finance laws: out the window. Bribery statutes: gone. Extortion: no more. This is Donald Trump's fondest figurative dream: to be able to shoot someone on Fifth Avenue and get away with it.

Paul Begala, *Presenting the Ludicrous 'Dershowitz Doctrine,'* (CNN online commentary, posted Jan. 29, 2020, at 9:11 p.m.).

23-11270                Opinion of the Court                19

> The President's defense team [Dershowitz] seems to be redefining the powers of the President, redefining them towards infinity. . . . If you look at what he says there it blows your mind.  He says if a President is running for re-election because he thinks getting elected will help America, he can do anything, anything.  And that redefines the presidency and, frankly, redefines America.

John Berman, *New Day* (CNN television broadcast, aired Jan. 30, 2020, at 6:17 a.m.).

23-11270              LAGOA, J., Concurring                    1

LAGOA, Circuit Judge, concurring:

I concur with the majority because, under *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), we are obliged to hold public-figure defamation plaintiffs to the actual-malice standard—a standard that "has *no relation* to the text, history, or structure of the Constitution." *Tah v. Global Witness Publ'g, Inc.*, 991 F.3d 231, 251 (D.C. Cir. 2021) (Silberman, J., dissenting in part). I write separately to explain my view of the harm *Sullivan* has caused in our First Amendment jurisprudence.

**I.**

As a preliminary matter, there can be little dispute that CNN "defamed" Alan Dershowitz under any common understanding of that term. CNN, through its various writers and anchors, repeatedly misrepresented statements that Dershowitz made on the floor of the Senate—that is, statements whose accuracy could easily be verified against the Senate transcript and video footage, and which CNN's employees all could have watched live. In some instances, they blurred the line between fact and commentary, and in others, they simply lied about what Dershowitz had said. And—though damages were not ultimately tested at trial—Dershowitz offered evidence at the summary-judgment stage to show that he was harmed as a result because news outlets he finds more desirable stopped inviting him to speak after the CNN coverage, and he was left with access only to platforms he found less

2                    LAGOA, J., Concurring                    23-11270

desirable. All of this is to say, I agree with the district court that the only thing standing between Dershowitz and justice is *Sullivan*.

Sullivan and its progeny are policy-driven decisions dressed up as constitutional law, and they find little—if any—support in our history.[1] At common law, when the First and Fourteenth Amendments were ratified, public figures asserting libel claims were not held to any sort of heightened standard. *McKee v. Cosby*, 586 U.S. 1172, 1176–77 (2019) (Thomas, J., concurring in denial of certiorari). From the Founding until *Sullivan*, defamation and libel laws were "almost exclusively the business of state courts and legislatures," and "[u]nder the then prevailing state libel law, the defamed individual had only to prove a false written publication that subjected him to hatred, contempt, or ridicule." *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 765 (1985) (White, J., concurring in judgment). Truth was a defense, as it is now, but "general injury to reputation" was presumed and additional showings were required only for special and punitive damages. *See id.*

Indeed, prior to *Sullivan*, instead of heightening the standard a plaintiff had to meet in defamation actions, we "deemed libels against public figures to be, if anything, *more* serious and injurious

---

[1] As the district court observed in the summary judgment order below, *Sullivan* is "a great example of how bad facts can contribute to the making of unnecessary law, and why judges and Justices should not be in the business of policy writing." *Dershowitz v. Cable News Network, Inc.*, 668 F. Supp. 3d 1278, 1286 (S.D. Fla. 2023).

23-11270                LAGOA, J., Concurring                3

than ordinary libels." *McKee*, 586 U.S. at 1177 (Thomas, J., concurring in denial of certiorari).  Blackstone, for example, defined libel as "malicious defamation[] of any person, and especially a magistrate, made public by either printing, writing, signs, or pictures, in order to provoke him to wrath, or expose him to public hatred, contempt, and ridicule."  4 William Blackstone, Commentaries *150.  And—far from endorsing greater skepticism of public-figure defamation claims—Blackstone observed that "[w]ords also tending to scandalize a magistrate, or a person in public trust, are reputed more highly injurious than when spoken of a private man."  3 Blackstone *124.  In 1808, the Supreme Judicial Court of Massachusetts explained why this was so, noting that "the publication of falsehood and calumny against public officers, or candidates for public offices, is an offence most dangerous to the people, and deserves punishment, because the people may be deceived, and reject the best citizens, to their great injury, and it may be to the loss of their liberties." *Commonwealth v. Clap*, 4 Mass. (1 Tyng) 163, 169–70 (Mass. 1808); *see also, e.g.*, *Nev. State J. Publ'g Co. v. Henderson*, 294 F. 60, 63 (9th Cir. 1923) (affirming the propriety of a jury instruction that included, in part, the admonition that "[n]either the newspaper nor the citizen may with impunity falsely charge the candidate or the public officer with specific acts of criminality or shameful misconduct").  Justice Story, riding circuit in Rhode Island, declared it "as plain and well settled as any doctrine of the law" that, as to libel, "[t]he liberty of speech, or of the press, has nothing to do with this subject.  They are not endangered by the punishment of libellous publications.  The

4                    LAGOA, J., Concurring                    23-11270

liberty of speech and the liberty of the press do not authorize malicious and injurious defamation." *Dexter v. Spear*, 7 F. Cas. 624, 624 (C.C.D. R.I. 1825) (No. 3867).

## II.

*Sullivan*, however, upended this "plain and well settled" model and took "the first major step in what proved to be a seemingly irreversible process of constitutionalizing the entire law of libel and slander." *Dun & Bradstreet*, 472 U.S. at 766 (White, J., concurring in judgment). In *Sullivan*, the Court usurped control over this field of speech-related torts and invented "a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." 367 U.S. at 279–80. Three years later, this same rule was extended to "public figures" in addition to public officials. *See Dun & Bradstreet*, 472 U.S. at 766 (White, J., concurring in judgment) (citing *Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 155 (1967)). Certain members of the Court attempted to extend this principle even further. In *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29 (1971), for example, at least three Justices would have stretched *Sullivan* to apply to private plaintiffs, imposing an across-the-board actual-malice standard. *See Dun & Bradstreet*, 472 U.S. at 766 (White, J., concurring in judgment) (citing *Rosenbloom*, 403 U.S. at 52–57). Fortunately for private plaintiffs, the authoring Justices failed to secure a majority vote as to that point. Three years later, however, in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974), the Court

23-11270                 Lagoa, J., Concurring                  5

held for the first time that falsity and harm were not enough, and even private plaintiffs must show some sort of "fault," negligence at the least, to recover for defamation. *See Dun & Bradstreet*, 472 U.S. at 766 (White, J., concurring in judgment) (citing *Gertz*, 418 U.S. at 347, 350). And, even with that proof of culpable fault, damages were not presumed but had to be proven. *See id.* (citing *Gertz*, 418 U.S. at 349). Finally, *Gertz* established that no plaintiff could recover punitive damages for defamation without showing *Sullivan*-style malice. *See id.* (citing *Gertz*, 418 U.S. at 350). With this series of cases—*Sullivan*, *Curtis*, *Rosenbloom*, and *Gertz*—one generation of the Supreme Court succeeded in imposing federal constitutional limitations (seemingly untethered to the Constitution's original meaning) on all defamation claims brought by all manner of plaintiffs.

Justice White recognized the ill-fated trajectory of this line of cases after originally joining the majority in *Sullivan*. In his concurrence in *Dun & Bradstreet*, Justice White described his epiphany as follows:

> I joined the judgment and opinion in *New York Times*. I also joined later decisions extending the *New York Times* standard to other situations. But I came to have increasing doubts about the soundness of the Court's approach and about some of the assumptions underlying it. I could not join the plurality opinion in *Rosenbloom,* and I dissented in *Gertz,* asserting that the common-law remedies should be retained for private plaintiffs. I remain convinced that *Gertz* was erroneously decided. I have also become convinced

6                    LAGOA, J., Concurring                    23-11270

that the Court struck an improvident balance in
the *New York Times* case between the public's interest
in being fully informed about public officials and
public affairs and the competing interest of those who
have been defamed in vindicating their reputation.

472 U.S. at 767 (White, J., concurring in judgment).  In the
explanation that followed, Justice White elaborated on the central
problem in *Sullivan*: A people who govern themselves, as the
Founders intended us to do, are entitled to adequate information
about their government and their representatives, and that essential
flow of information warrants First Amendment protection; but
protecting lies—by insulating those who spread them behind an
iron barrier, to be breached only by a showing of actual malice—
does nothing to support an informed populus and, instead, has the
contrary effect of leaving lies uncorrected.  *See id.* at 767–69; *see also
id.* at 769 ("Also, by leaving the lie uncorrected, the *New York Times*
rule plainly leaves the public official without a remedy for the
damage to his reputation.  Yet the Court has observed that the
individual's right to the protection of his own good name is a basic
consideration of our constitutional system, reflecting '"our basic
concept of the essential dignity and worth of every human being—
a concept at the root of any decent system of ordered liberty."'"
(quoting *Gertz*, 418 U.S. at 341)).

As the Court concluded in *Gertz*, "there is no constitutional
value in false statements of fact.  Neither the intentional lie nor the
careless error materially advances society's interest in 'uninhibited,
robust, and wide-open' debate on public issues."  418 U.S. at 340.

23-11270                LAGOA, J., Concurring                7

But that is precisely *Sullivan*'s effect.  Under the actual-malice standard, the public's "only chance of being accurately informed is measured by the public [figure's] ability himself to counter the lie, unaided by the courts.  That is a decidedly weak reed to depend on for the vindication of First Amendment interests." *Dun & Bradstreet*, 472 U.S. at 768–69 (White, J., concurring in judgment); *see also Rosenbloom*, 403 U.S. at 46 ("While the argument that public figures need less protection because they can command media attention to counter criticism may be true for some very prominent people, even then it is the rare case where the denial overtakes the original charge.  Denials, retractions, and corrections are not 'hot' news, and rarely receive the prominence of the original story."); *Gertz*, 418 U.S. at 370 (White, J., dissenting) ("As I see it, there are wholly insufficient grounds for scuttling the libel laws of the States in such a wholesale fashion, to say nothing of deprecating the reputation interest of ordinary citizens and rendering them powerless to protect themselves.").

Quite the journey we have taken from *Sullivan*'s attempt to protect the public's interest in being fully informed on matters of public import.  But that, in fact, precisely identifies the error at the heart of *Sullivan*: In "federaliz[ing] major aspects of libel law by declaring unconstitutional in important respects the prevailing defamation law in all or most of the 50 States," *Gertz*, 418 U.S. at 370 (White, J., dissenting), the Court "made little effort to ground [its] holdings in the original meaning of the Constitution," *McKee*, 586 U.S. at 1173 (Thomas, J., concurring in denial of certiorari).  As Justice Thomas pointedly observed in *McKee*, in its attempt to strike

8                      LAGOA, J., Concurring                      23-11270

a balance between "the law of defamation and the freedoms of speech and press protected by the First Amendment," *Gertz*, 418 U.S. at 355 (Douglas, J., dissenting), the *Sullivan* Court consulted a wide variety of sources: "general proposition[s]" about the value of free speech and the inevitability of false statements, *see Sullivan*, 376 U.S., at 269–72 & n.13; judicial decisions involving criminal contempt and official immunity, *id.* at 272–73, 282–83; public responses to the Sedition Act of 1798, *id.* at 273–77; comparisons of civil libel damages to criminal fines, *id.* at 277–78; policy arguments against "self-censorship," *id.* at 278–79; the "consensus of scholarly opinion," *id.* at 280 n.20; and state defamation laws, *id.*, at 280–82. *McKee*, 586 U.S. at 1175 (Thomas, J., concurring in denial of certiorari). But notably absent from this litany of sources is *anything* informing the original meaning of the First Amendment or the original understanding of the Fourteenth Amendment at the time of its ratification.[2]  Thus although the Court declared that its

---

[2] I recognize the "ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)." *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 37 (2022); *see also United States v. Rahimi*, 602 U.S. 680, 692 n.1 (2024) (same). As in *Bruen* and *Rahimi*, resolving this dispute is unnecessary here because the public understanding of the right to free speech was, for all relevant purposes, the same with respect to public figures at both moments in our constitutional history—and, as I explain throughout, the actual-malice standard did not emerge until a century after ratification of the Fourteenth Amendment.

23-11270                LAGOA, J., Concurring                    9

actual-malice standard was "required by the First and Fourteenth Amendments," *Sullivan*, 376 U.S. at 283, "it made no attempt to base that rule on the original understanding of those provisions," *McKee*, 586 U.S. at 1175 (Thomas, J., concurring in denial of certiorari).  On the contrary, the Court itself has subsequently acknowledged that "the rule enunciated in the New York Times case . . . is . . . largely a judge-made rule of law," which "is not revealed simply by its literal text, but rather is given meaning through the evolutionary process of common-law adjudication." *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 501–02 (1984).

### III.

What, then, does the original meaning of the First Amendment tell us about the propriety of an actual-malice standard?  To understand the original meaning of the First Amendment is to understand law as those who ratified it did.  Our starting place is, therefore, the natural law and our accompanying natural rights as they were understood pre-ratification.  Natural rights are those that we possess innately as human beings; their existence does not depend on government endowment.  *See generally* Jud Campbell, *Natural Rights and the First Amendment*, 127 Yale L.J. 246, 268–80 (2017).  As to expression, our Founders recognized a variety of natural rights, including (as relevant here) speaking, writing, and publishing.  *See id.* at 269; *see also, e.g.*, 4 Annals of Cong. 918 (1794) (statement of Rep. William Giles) (addressing the "the inalienable privilege of thinking, of speaking, of writing, and of printing"); Proposal by Roger Sherman to House

Committee of Eleven (July 21–28, 1789), in The Complete Bill of Rights: The Drafts, Debates, Sources, and Origins 83 (Neil H. Cogan ed., 1997) ("Speaking, writing and publishing" are among "certain natural rights which are retained"); Resolution of the Virginia House of Delegates, Va. Gazette, & Gen. Advertiser (Richmond), Jan. 3, 1798, at 2 (referring to the "natural right of speaking and writing freely"); Letter from Thomas Jefferson to David Humphreys (Mar. 18, 1789), *in* 14 The Papers of Thomas Jefferson, 676, 678 (Julian P. Boyd ed. 1971) ("[R]ights which it is useless to surrender to the government" include "the rights of thinking, and publishing our thoughts by speaking or writing"); Letter from Thomas Paine to Thomas Jefferson (Mar. 1788), *in* 13 The Papers of Thomas Jefferson at 4, 5 (1956) ("[N]atural rights" include "the rights of thinking, speaking, forming and giving opinions"). The "liberty of the press," meaning the freedom to print information, fell within the scope of natural rights that pre-existed our Bill of Rights. *See, e.g.*, James Alexander, Letter to the Editor, Pa. Gazette (Philadelphia), Nov. 24, 1737, *reprinted in* Freedom of the Press from Zenger to Jefferson, 62, 66 (Leonard W. Levy ed., 1996) (identifying "freedom of speech and liberty of the press" as "natural rights"). Closely related to freedom of the press—distinct, according to some; overlapping according to others—was the freedom to publish, most closely encapsulating that which we now think of as "journalism." *See* Campbell at 270 (first citing 8 Annals of Cong. 2147–48 (1798) (statement of Rep. Otis) (distinguishing "the liberty of writing, publishing, and speaking" from "the freedom of the press"), then

23-11270              LAGOA, J., Concurring                    11

citing *American Intelligence*, Indep. Gazetteer (Philadelphia), Jan. 5, 1789, at 3 ("Freedom of speech, which is nothing more than the freedom of press, is the great bulwark of liberty"), and then citing *Of the Liberty of the Press and Elections*, London Evening Post, Oct. 29, Nov. 9, Nov. 14, 1754, *reprinted in* 16 Scots Magazine 518–19 (1754) (referring generally to "the liberty of individuals to communicate their thoughts to the public")). There is little doubt, then, that our Founding generation recognized the freedoms to think, speak, write, print, and share ideas as natural rights endowed in the people by their Creator, not their government.

With the natural right established, we turn to the limits the government was authorized to impose on speech.[3] Those limits turn on two central inquiries: the scope of the natural right and the extent to which we, as a people, agreed to some restraint of the natural right in exchange for the benefits that nationhood offered. Enter here the concept of natural law, which, at the least, provides the understanding that, regardless of any government structure, one individual may not interfere with another's natural rights. *See* Campbell at 271; Philip A. Hamburger, *Natural Rights, Natural Law, and American Constitutions*, 102 Yale L.J. 907, 922–30 (1993) ("[B]eing equally free, individuals did not have a right to infringe the equal rights of others, and, correctly understood, even self-preservation typically required individuals to cooperate—to avoid

---

[3] Hereinafter, I use "speech" as a catch-all term to encompass oral speech, writing, printing, circulating, and otherwise expressing one's ideas to an audience.

doing unto others what they would not have others do unto them." (citing John Locke, Two Treatises of Government 290 (Peter Laslett et., 2d ed. 1967) (bk. II, ch. ii, § 8))). As James Wilson explained it in his 1790 Lectures on Law, as to avoiding injury and injustice under the natural law, each person may act "for the accomplishment of those purposes, in such a manner, and upon such objects, as his inclination and judgment shall direct; provided he does no injury to others; and provided some publick interests do not demand his labours. This right is natural liberty." James Wilson, *Of the Natural Rights of Individuals*, *in* 2 Collected Works of James Wilson 1055–56 (Kermit L. Hall & Mark David Hall eds., 2007).

Consider also social-contract theory, or the idea that those who formed a body politic surrendered some of their liberty in doing so. Views on this were quite varied. *See* Campbell at 273–75. Blackstone, for one, believed that "every man, when he enters into society, gives up a part of his natural liberty." 1 Blackstone *125. Others viewed it as "necessary to give up [natural] liberty" or at least necessary to "surrender[] the power of controuling . . . natural alienable rights." 1 Zephaniah Swift, A Digest of the Laws of the State of Connecticut 15 (New Haven, S. Converse 1822); Theophilus Parsons, *Essex Result*, *reprinted in* Memoir of Theophilus Parsons 359, 366 (Boston, Ticknor & Fields 1861). At the other end of the spectrum were those who held fast that "the people surrender nothing" in establishing a nation. The Federalist No. 84, at 578 (Alexander Hamilton) (Jacob E. Cooke ed., 1961).

23-11270                    LAGOA, J., Concurring                    13

These competing views on the limits imposed by a social contract largely mirrored competing views on the scope of natural rights themselves: Thomas Jefferson, for one, maintained that "the idea is quite unfounded, that on entering into society we give up any natural right," but this view traveled hand in hand with his belief that natural rights were inherently limited by a bar on "commit[ting] aggression on the equal rights of another" and the "natural duty of contributing to the necessities of the society." Letter from Thomas Jefferson to Francis W. Gilmer (June 7, 1816), *reprinted in* 15 Writings of Thomas Jefferson 23, 24 (Andrew A. Lipscomb & Albert Ellery Bergh eds., 1905); *see also* Campbell at 274. In other words, if the natural law already imposed measured limits on the exercise of a natural right, nothing additional need be sacrificed by entry into the social contract of a structured society.

Natural law scholar Jud Campbell has summarized the result of these tensions and balances, explaining that "whether inherently limited by natural law or qualified by an imagined social contract, retained natural rights were circumscribed by political authority to pursue the general welfare. Decisions about the public good, however, were left to the people and their representatives—not to judges—thus making natural rights more of a constitutional lodestar than a source of judicially enforceable law." Campbell at 276. Thus, the Founders simultaneously understood that freedom of speech was both a natural right not dependent on government creation, and also subject to certain limitations for the public good—so long as those limitations did not *abridge* the natural right as it existed in a system of natural law. And while the freedoms of

speech and of the press were both viewed as natural rights, they were viewed as properly subject to different regulation, with recognition that written statements were "more extended" and "more strongly fixed," thus "posing a greater threat to public order." *Id.* at 280 (citing James Sullivan, Dissertation upon the Constitutional Freedom of the Press in the United States 12 (Boston, Joseph Nancrede ed.,1801)).

We turn next to the contours of the natural right and the natural law, and the types of restriction that were viewed as consistent with those boundaries. The Founders widely believed that "opinions," as James Madison observed to his colleagues, "are not the objects of legislation." Annals of Cong. 934 (1794) (statement of Rep. James Madison); *see also* Francis Hutcheson, An Inquiry into the Original of Our Ideas of Beauty and Virtue: In Two Treatises 185 (Knud Haakonssen ed., 2004) (1726) (explaining that "the Right of private Judgment, or of our inward Sentiments, is unalienable; since we cannot command ourselves to think what either we our selves or any other Person please"). In other words, opinion, understood as non-volitional thought, was not subject to government regulation at the time of the Founding. *See* Campbell at 281 (first citing PA Const. of 1776, ch. 1, § 12 (protecting the freedom to express "sentiments"), and then citing PA Const. of 1790, art. IX, § 7 (enshrining freedom of "thoughts and opinions")); *see also* Letter from Thomas Jefferson to David Humphreys (Mar. 18, 1789), *in* 14 The Papers Of Thomas Jefferson, at 676, 678 (1958) (identifying "the rights of thinking, and publishing our thoughts by

23-11270                    LAGOA, J., Concurring                    15

speaking or writing," as natural rights not surrendered to government restriction).

But the freedom of opinion raises another question: What forms an opinion? History confirms that the freedom to express opinions was, indeed, limited to *honest* statements and did not encompass dishonesty or deceit. For instance, even in the debates over the Sedition Act, a persistent and widespread consensus emerged that "well-intentioned statements of opinion, including criticisms of government, were constitutionally shielded." Campbell at 284; *see also* Alexander Addison, Analysis of the Report of the Committee of the Virginia Assembly, on the Proceedings of Sundry of the Other States in Answer to their Resolutions 42 (Philadelphia, Zachariah Poulson Jr., ed., 1800) ("[I]t is well known that, as by the common law of England, so by the common law of America, and by the Sedition act, every individual is at liberty to expose, in the strongest terms, consistent with decency and truth all the errors of any department of the government.").

Consistent with the notion that the natural right to free speech coexisted with a limitation forbidding injurious lies, "10 of the 14 States that had ratified the Constitution by 1792 had themselves provided constitutional guarantees for free expression,[4] and 13 of the 14 nevertheless provided for the

---

4 *See* Del. Const. 1792, Art. I, § 5; Ga. Const. 1777, Art. LXI; Md. Const. 1776, Declaration of Rights, § 38; Mass. Const. 1780, Declaration of Rights, Art. XVI; N.H. Const. 1784, Art. 1, § 22; N.C. Const. 1776, Declaration of Rights, Art. XV; Pa. Const. 1776, Declaration of Rights, Art. XII; S.C. Const. 1778, Art.

16                      LAGOA, J., Concurring                      23-11270

prosecution of libels.[5]"   *Gertz*, 418 U.S. at 380–81 (White, J., dissenting) (citing *Roth v. United States*, 354 U.S. 476, 482 (1957)).

**IV.**

What do we take away from the original sources?  As the Supreme Court observed in *Roth*, "[t]he protection given speech and press was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people," 354 U.S. at 484, but such assurance focused on the exchange of ideas in service of advancing truth and imposed no additional burdens to recovery based on the harmed party's station in society.  In a 1774 letter to the inhabitants of Quebec, the Continental Congress expressed the following objective:

> The last right we shall mention, regards the freedom of the press. The importance of this consists, besides the advancement of truth, science,

XLIII; Vt. Const. 1777, Declaration of Rights, Art. XIV; Va. Bill of Rights, 1776, § 12.

5 *See* Act to Secure the Freedom of the Press (1804), 1 Conn. Pub. Stat. Laws 355 (1808); Del. Const. 1792, Art. I, § 5; Ga. Penal Code, Eighth Div., § 8 (1817), Digest of the Laws of Ga. 364 (Prince 1822); Act of 1803, c. 54, II Md. Public General Laws 1096 (Poe 1888); *Commonwealth v. Kneeland*, 37 Mass. 206, 232 (Mass. 1838); Act for the Punishment of Certain Crimes Not Capital (1791), Laws of N.H. 253 (1792); Act Respecting Libels (1799), N.J. Rev. Laws 411 (1800); *People v. Croswell*, 3 Johns. Cas. 337 (N.Y. 1804); Act of 1803, c. 632, 2 Laws of N.C. 999 (1821); Pa. Const. 1790, Art. 9, § 7; R.I. Code of Laws (1647), Proceedings of the First General Assembly and Code of Laws 44–45 (1647); R.I. Const. 1842, Art. I, § 20; Act of 1804, 1 Laws of Vt. 366; *Commonwealth v. Morris*, 3 Va. (1 Va. Cas.) 176 (Va. 1811).

23-11270                LAGOA, J., Concurring                17

morality, and arts in general, in its diffusion of liberal sentiments on the administration of Government, its ready communication of thoughts between subjects, and its consequential promotion of union among them, whereby oppressive officers are shamed or intimidated, into more honourable and just modes of conducting affairs.

1 Journals of the Continental Congress 108 (1774). This statement from the Continental Congress, as the Court said in *Roth*, supports a conclusion that "[a]ll ideas having even the slightest redeeming social importance—unorthodox ideas, controversial ideas, even ideas hateful to the prevailing climate of opinion—have the full protection of the guaranties, unless excludable because they encroach upon the limited area of more important interests." *Roth*, 354 U.S. at 484. Among those "excludable" expressions, we can only conclude, are those that patently do not serve "the advancement of truth." *See* 1 Journals of the Continental Congress 108.

Notably absent from the historical discussion is anything resembling a heightened requirement making it *more* difficult to prosecute libel or slander directed at an official (much less a "public figure") rather than a private citizen. On the contrary, the accepted consensus was that public officials could sue for libel "upon the same footing with a private individual" because "[t]he character of every man should be deemed equally sacred, and of consequence entitled to equal remedy." Tunis Wortman, *A Treatise, Concerning Political Enquiry, and the Liberty of the Press* 259 (New York George

18                      LAGOA, J., Concurring                      23-11270

Forman, ed., 1800); *accord* St. George Tucker, *View of the Constitution of the United States with Selected Writings* 237–38 (Clyde N. Wilson, ed., 1999) (1803) ("[T]he judicial courts of the respective states are open to all persons alike, for the redress of injuries of this nature; there, no distinction is made between one individual and another; the farmer, and the man in authority, stand upon the same ground: both are equally entitled to redress for any false aspersion on their respective characters, nor is there any thing in our laws or constitution which abridges this right.").

From all this, I conclude, as Justice White did in *Gertz*, that "[s]cant, if any, evidence exists that the First Amendment was intended to abolish the common law of libel, at least to the extent of depriving ordinary citizens of meaningful redress against their defamers." 418 U.S. at 381 (White, J., dissenting). What the historical documents suggest is that, in its original context, the First Amendment was intended to protect free dissemination of ideas— all manner of ideas, particularly those out of fashion or disfavored—but *not* the dissemination of lies. *See, e.g.*, 10 Benjamin Franklin Writings 38 (1907) ("If by the *Liberty of the Press* were understood merely the Liberty of discussing the Propriety of Public Measures and political opinions, let us have as much of it as you please: But if it means the Liberty of affronting, calumniating, and defaming one another, I, for my part, own myself willing to part with my Share of it when our Legislators shall please so to alter the Law, and shall cheerfully consent to exchange my *Liberty* of Abusing others for the *Privilege* of not being abus'd myself."); Frank Luther Mott, Jefferson and the Press 14 (1943)

23-11270                    LAGOA, J., Concurring                    19

(explaining that Thomas Jefferson endorsed the language of the First Amendment as ratified only after suggesting that "[t]he people shall not be deprived of their right to speak, to write, or *otherwise* to publish anything but false facts affecting injuriously the life, liberty or reputation of others").

And we held onto that principle for the first two centuries of our national existence. *See, e.g.*, *Near v. Minnesota*, 283 U.S. 697, 715 (1931) ("But it is recognized that punishment for the abuse of the liberty accorded to the press is essential to the protection of the public, and that the common-law rules that subject the libeler to responsibility for the public offense, as well as for the private injury, are not abolished by the protection extended in our [state and federal] Constitutions.  The law of criminal libel rests upon that secure foundation." (citation omitted)).

Just a decade before *Sullivan*, the Supreme Court reiterated as much, explaining that "[l]ibelous utterances not being within the area of constitutionally protected speech, it is unnecessary, either for us or for the State courts, to consider the issues behind the phrase 'clear and present danger.'" *Beauharnais v. People of the State of Ill.*, 343 U.S. 250, 266 (1952).  But, as we know, this interpretation of the First Amendment, true to its original meaning, fell apart shortly thereafter.

## V.

As expressed by Justice White, *Sullivan* and its progeny represent "an ill-considered exercise of the power entrusted to [the] Court."  *Gertz*, 418 U.S. at 370 (White, J., dissenting).  The lasting

20                              LAGOA, J., Concurring                         23-11270

effect of *Sullivan*, as anyone who ever turns on the news or opens a social media app knows well, is that media organizations can "cast false aspersions on public figures with near impunity," *Tah*, 991 F.3d at 254 (Silberman, J., dissenting in part), causing untold harm to public figures and the general public alike. Jettisoning the original meaning of the First Amendment—and centuries of common law faithful to that meaning—has left us in an untenable place, where by virtue of having achieved some bit of notoriety in the public sphere, defamation victims are left with scant chance at recourse for clear harms. But until the Supreme Court reconsiders *Sullivan*, we are bound by it, and I therefore must concur.

23-11270                    WILSON, J., Concurring                         1

WILSON, Circuit Judge, Concurring:

I concur with the majority but write separately to express my reservations about suggestions that the Supreme Court should reconsider *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964). "Fidelity to precedent—the policy of *stare decisis*—is vital to the proper exercise of the judicial function." *Citizens United v. FEC*, 558 U.S. 310, 377 (2010) (Roberts, C.J., concurring). I believe that *Sullivan* reflects "the accumulated wisdom of judges who have previously tried to solve the same problem," *Ramos v. Louisiana*, 590 U.S. 83, 115–16 (2020) (Kavanaugh, J., concurring).

To be sure, our understanding of the First Amendment should be guided by its original meaning and heed common law traditions. But "ambiguous historical evidence," *Gamble v. United States*, 587 U.S. 678, 691 (2019), does not justify casting aside a unanimous Supreme Court decision and nearly sixty years of settled precedent. The "real-world consequences" and reliance interests at stake counsel us to pump the brakes before calling to overrule *Sullivan*. *See Ramos*, 590 U.S. at 122 (Kavanaugh, J., concurring).

## I.

Adherence to precedent is "a foundation stone of the rule of law." *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 798 (2014). Stare decisis is the "means by which we ensure that the law will not merely change erratically, but will develop in a principled and intelligible fashion," and "permits society to presume that bedrock principles are founded in the law rather than in the proclivities of individuals." *Vasquez v. Hillery*, 474 U.S. 254, 265–66 (1986); *accord. Payne*

*v. Tennessee*, 501 U.S. 808, 827 (1991). Indeed, "the entire idea of *stare decisis* is that judges do not get to reverse a decision just because they never liked it in the first instance." *Knick v. Twp. of Scott*, 588 U.S. 180, 224 (2019) (Kagan, J., dissenting).

"The Framers of our Constitution understood that the doctrine of *stare decisis* is part of the 'judicial Power' and rooted in Article III of the Constitution." *Ramos*, 590 U.S. at 116 (Kavanaugh, J., concurring). Alexander Hamilton wrote that to "avoid an arbitrary discretion in the courts, it is indispensable" that federal judges "should be bound down by strict rules and precedents, which serve to define and point out their duty in every particular case that comes before them." *Id.* (quoting The Federalist No. 78, p. 529 (J. Cooke ed. 1961)). Blackstone wrote that "it is an established rule to abide by former precedents," to "keep the scale of justice even and steady, and not liable to waver with every new judge's opinion." *Id.* (quoting 1 W. Blackstone, Commentaries on the Laws of England 69 (1765)).

Of course, Judges and even Justices, are fallible. *Cf. Brown v. Allen*, 344 U.S. 443, 540 (1953) (Jackson, J., concurring). And it is especially important for the Court to correct errors in constitutional rulings, which "Congress cannot override . . . by ordinary legislation." *Gamble*, 587 U.S. at 691. But even in constitutional cases, the Supreme Court "has always held that 'any departure'" from precedent "demands special justification." *Michigan*, 572 U.S. at 798 (quoting *Arizona v. Rumsey*, 467 U.S. 203, 212 (1984)). This is especially true when the constitutional protections recognized by

the precedent have "become part of our national culture." *Dickerson v. United States*, 530 U.S. 428, 443 (2000). The strength of the case for adhering to such decisions only grows in proportion to their "antiquity." *Montejo v. Louisiana*, 556 U.S. 778, 792 (2009).

In his concurring opinion in *Ramos v. Louisiana*, Justice Kavanaugh synthesized the Supreme Court's "varied and somewhat elastic *stare decisis* factors" into "three broad considerations" to determine what qualifies as a "special justification" or "strong grounds" to overrule a prior constitutional decision. 590 U.S. at 121.

First, the precedent must be "egregiously wrong as a matter of law." *Id.* at 122. "A garden-variety error or disagreement does not suffice to overrule." *Id.* at 121–22. The Court examines factors such as "the quality of the precedent's reasoning, consistency and coherence with other decisions, changed law, changed facts, and workability." *Id.* at 122. Second, the Court considers whether "the prior decision caused significant negative jurisprudential or real-world consequences." *Id.* This includes both "jurisprudential consequences," such as "workability, . . . consistency and coherence with other decisions," and "the precedent's real-world effects on the citizenry." *Id.* Finally, the Court examines whether "overruling the prior decision unduly upset reliance interests." *Id.* "This consideration focuses on the legitimate expectations of those who have reasonably relied on the precedent. In conducting that inquiry, the Court may examine a variety of reliance interests and the age of the precedent, among other factors." *Id.*

Using *Ramos* as my guide, I first inquire into "how wrong" *Sullivan* is as a matter of law before turning to a "sober appraisal of the disadvantages of the innovation as well as those of the questioned case, a weighing of practical effects of one against the other." *Id.* at 122–23 (quotation marks omitted).

### A. Step One: Was Sullivan Wrongly Decided?

Before overturning a long-settled precedent like *Sullivan*, the Court requires more than "just an argument that the precedent was wrongly decided." *Halliburton Co. v. Erica P. John Fund*, 573 U.S. 258, 266 (2014). The First Amendment's history and jurisprudence tell us *Sullivan* was, at the very least, not "egregiously wrong," *see* Ramos, 590 U.S. at 122 (Kavanaugh, J., concurring).

In *Sullivan*, a unanimous Supreme Court held that the First Amendment, as applied to the states through the Fourteenth Amendment, limits application of state libel and defamation laws. 376 U.S. at 283. The "constitutional guarantees" of free press required "a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* at 279–80.

*Sullivan*'s "actual malice" requirement "has its counterpart in rules previously adopted by a number of state courts and extensively reviewed by scholars for generations." *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 502 (1984). The rule is premised both on "common-law tradition" and "the unique character of the

23-11270              WILSON, J., Concurring                    5

interest" it protects. *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 685–86 (1989) (footnote omitted).

*Sullivan* was "widely perceived as essentially protective of press freedoms," and "has been repeatedly affirmed as the appropriate First Amendment standard applicable in libel actions brought by public officials and public figures." *Herbert v. Lando*, 441 U.S. 153, 169 (1979). It "honored both the Court's previous recognition that 'libel' is not protected by the First Amendment and its concomitant obligation to determine the definitional contours of that category of unprotected speech." Lee Levine & Stephen Wermiel, *What Would Justice Brennan Say to Justice Thomas?*, 34 Commn's Law. 1, 2 (2019).

For decades after *Sullivan,* even as defamation plaintiffs petitioned the Court to limit or overrule the case, the Court refused. Matthew L. Schafer, *In Defense:* New York Times v. Sullivan, 82 La. L. Rev. 81, 84 & n.18 (2021). Although it faced some academic skepticism since the 1980s,[1] a "growing movement to engineer the overruling of *Sullivan*" has emerged in recent years, fueled by the idea that it represents an exercise of "judicial policymaking." *See* Samantha Barbas, New York Times v. Sullivan: *Perspectives from History*, 30 Geo Mason L. Rev. F. 1, 2 (2023).

These calls intensified in 2019, after Justice Thomas authored an opinion concurring in the denial of certiorari in *McKee v.*

---

[1] *E.g.*, Richard A. Epstein, *Was* New York Times v. Sullivan *Wrong?*, 53 U. Chi. L. Rev. 782 (1986).

*Cosby* to question *Sullivan's* actual-malice requirement. 586 U.S. 1172, 1172 (2019). According to Justice Thomas, the unanimous *Sullivan* Court and the decades of Supreme Court caselaw that applied it failed to make "a sustained effort to ground their holdings in the Constitution's original meaning." *Id.* at 1175. In his view, these rulings "broke sharply from the common law of libel, and there are sound reasons to question whether the First and Fourteenth Amendments displaced this body of common law." *Id.* at 1176. Rather, *Sullivan* "and the Court's decisions extending it were policy-driven decisions masquerading as constitutional law." *Id.* at 1173. Justice Gorsuch later echoed this critique in *Berisha v. Lawson*, 141 S. Ct. 2424, 2425 (2021) (Gorsuch, J., dissenting from denial of certiorari).

In perhaps their own form of "ideological lockstep" or "unwelcome groupthink," others echoed this "originalist" interpretation of state libel law. *E.g.*, *Tah v. Glob. Witness Publ'g, Inc.*, 991 F.3d 231, 251 (D.C. Cir. 2021) (Silberman, J., dissenting). The district court here did the same, criticizing *Sullivan* as "a great example of how bad facts can contribute to the making of unnecessary law, and why judges and Justices should not be in the business of policy writing." *Dershowitz v. Cable News Network, Inc.*, 668 F. Supp. 3d 1278, 1286–87 (S.D. Fla. 2023).

But a policy argument couched in history is still a policy argument. And experience tells us that "disputed history provides treacherous ground on which to build decisions written by judges who are not expert at history." *Cf. McDonald v. City of Chicago*, 561

23-11270          WILSON, J., Concurring          7

U.S. 742, 914 (2010) (Breyer, J., dissenting). *See generally* Schafer, *supra*, at 132–44 (detailing the flaws in *McKee* and *Berisha*'s historical analysis).[2]

      History's flaws are especially apparent when confronting the law of libel in the United States, which "is not now, nor ever was, tidy." Schafer, *supra*, at 97. "The founding generation and the Congresses of the Reconstruction were not of one mind when it came to the common law of libel or the effect, if any, the First and Fourteenth Amendments had on it." *Id.* "We know very little of the precise intentions of the framers and ratifiers of the speech and press clauses of the first amendment" when it comes to defamation actions. *Ollman v. Evans*, 750 F.2d 970, 996 (D.C. Cir. 1984) (Bork, J., concurring). "But we do know that they gave into our keeping the

---

[2] *See also, e.g.*, Matthew L. Schafer, *In Defense:* New York Times v. Sullivan, 82 La. L. Rev. 81, 150 (2021) ("The freedom of the press that Thomas and Gorsuch espouse is not an originalist one; it is a monarchist's one, predating the Founding and purporting to import into the First Amendment today common law rules long ago rejected by the Founders and early courts. This approach, however, violates Thomas's own instruction that what matters for the purposes of an originalist inquiry is the 'founding era understanding.' Indeed, Thomas's view ignores that there was a Revolution, and that no small complaint of that Revolution was England's abuses of prosecutions of early American printers. It also ignores everything that happened between 1789 and 1868 when the Fourteenth Amendment made the First Amendment applicable as against the States. Thomas's failure to deal with this history draws into question his supposed commitment to it."); Josh Blackman, *Originalism and Stare Decisis in the Lower Courts*, 13 N.Y.U. J.L. & Liberty 44, 54–55 (2019) (recognizing the Seditious Conspiracy Act provides "some originalist basis to impose a higher bar for libel suits filed by government officials").

value of preserving free expression and, in particular, the preservation of political expression, which is commonly conceded to be the value at the core of those clauses." *Id.*

The Founders rejected early attempts to "transplant the English rule of libels on government to American soil." *See City of Chicago v. Trib. Co.*, 307 Ill. 595, 603 (1923). And "the restricted rules of the English law in respect of the freedom of the press in force when the Constitution was adopted were never accepted by the American colonists." *Grosjean v. Am. Press Co.*, 297 U.S. 233, 249 (1936). Rather, "[o]ne of the objects of the Revolution was to get rid of the English common law on liberty of speech and of the press." Henry Schofield, *Freedom of the Press in the United States*, 9 Proc. Am. Soc. Soc'y 67, 76 (1914).

Conflicting history aside, "[i]t is ironic that an approach so utterly dependent on tradition is so indifferent to our precedents." *Michael H. v. Gerald D.*, 491 U.S. 110, 138 (1989) (Brennan, J., dissenting). The Supreme Court's First Amendment jurisprudence "is one of continual development, as the Constitution's general command that 'Congress shall make no law . . . abridging the freedom of speech, or of the press,' has been applied to new circumstances requiring different adaptations of prior principles and precedents." *Denver Area Educ. Telecommc'ns Consortium, Inc. v. FCC*, 518 U.S. 727, 740 (1996). *Sullivan* is part of a "judicial tradition of a continuing evolution of doctrine to serve the central purpose of the first amendment." *Ollman*, 750 F.2d at 995 (Bork, J., concurring).

23-11270               WILSON, J., Concurring                    9

The consistent, guiding principle since the Founding and throughout our country's history is that the First Amendment "rests on the assumption that the widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public, that a free press is a condition of a free society." *Associated Press v. United States*, 326 U.S. 1, 20 (1945).

The First Amendment "preserve[s] an uninhibited marketplace of ideas in which truth will ultimately prevail." *Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 390 (1969). Our "profound national commitment to the free exchange of ideas . . . demands that the law of libel carve out an area of 'breathing space' so that protected speech is not discouraged." *Harte-Hanks Commc'ns,* 491 U.S. at 686. Allowing states to punish all errors in statements about the official conduct of public figures would be antithetical to the First Amendment, because "[w]hatever is added to the field of libel is taken from the field of free debate." *Sullivan*, 376 U.S. at 272. We must "protect some falsehood in order to protect speech that matters." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340–41 (1974).

Playing a key role in the marketplace, the "press serves and was designed to serve as a powerful antidote to any abuses of power by governmental officials and as a constitutionally chosen means for keeping officials elected by the people responsible to all the people whom they were selected to serve." *Mills v. Alabama*, 384 U.S. 214, 219 (1966). "Suppression of the right of the press to praise or criticize governmental agents . . . muzzles one of the very

agencies the Framers of our Constitution thoughtfully and deliberately selected to improve our society and keep it free." *Id.*

What was true in 1791, 1868, and 1964 remains true today: a libel law regime that allows public figures and officials to silence "speech that matters," *Gertz*, 418 U.S. at 340–41, absent complete accuracy, "dampens the vigor and limits the variety of public debate" and is "inconsistent with the First and Fourteenth Amendments." *Sullivan*, 376 U.S. at 279.

### B. *Negative Jurisprudential or Real-World Consequences*

At most, the complex history of libel law shows that *Sullivan*'s interpretation of the First Amendment was a "garden-variety error or disagreement" not "egregiously wrong." *See Ramos*, 590 U.S. at 121–22 (Kavanaugh, J., concurring). So I move to whether the decision "caused significant negative jurisprudential or real-world consequences." *See id.* at 122. Again, the answer is no. *Sullivan*'s actual-malice rule—shaped by the realities of libel litigation and refined by decades of precedent—represents a careful balance between the central First Amendment right to free discussion about matters of public concern and "the individual's interest in his reputation." *Herbert*, 441 U.S. at 169; *accord Monitor Patriot Co. v. Roy*, 401 U.S. 265, 276 (1971).

Looking first to jurisprudential consequences, such as consistency and workability, *Sullivan*'s actual-malice rule allows courts to "expeditiously weed out unmeritorious defamation suits" while "preserv[ing] First Amendment freedoms and giv[ing] reporters, commentators, bloggers, and tweeters (among others) the

23-11270                WILSON, J., Concurring                11

breathing room they need to pursue the truth." *Kahl v. Bureau of Nat'l Affs., Inc.*, 856 F.3d 106, 109 (D.C. Cir. 2017) (Kavanaugh, J.).

A return to the common-law defense that "the alleged libel was true in all its factual particulars," rather than malice, would be nearly unworkable. *See Sullivan*, 376 U.S. at 279. The "difficulties of separating fact from fiction convinced the Court in *New York Times*, *Butts*, *Gertz*, and similar cases to limit liability to instances where some degree of culpability is present in order to eliminate the risk of undue self-censorship and the suppression of truthful material." *Bose Corp.*, 466 U.S. at 513 (citation modified); *see also Sullivan*, 376 U.S. at 279 (citing examples). And hinging liability for public criticism on a judge or jury's determination of what is true deviates from the "marketplace of ideas" the First Amendment protects—where truth depends on an idea's competition with other ideas, not a government censor. Jane E. Kirtley *Uncommon Law: The Past, Present and Future of Libel Law in a Time of "Fake News" and "Enemies of the American People"*, 2020 U. Chi. L.F. 117, 123 (2020); *see also Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 56 (1988) ("For it is a central tenet of the First Amendment that the government must remain neutral in the marketplace of ideas.").

As far as "real-world effects on the citizenry," *Sullivan* allowed the public and the press to criticize public officials, 376 U.S. at 282–83, and public figures, *Gertz*, 418 U.S. at 351–52, and contribute to vital national dialogue without fear of unwarranted retaliation. Over the last sixty years, *Sullivan*'s "actual malice" requirement has consistently "ensure[d] that debate on public issues

12                    WILSON, J., Concurring                    23-11270

remains uninhibited, robust, and wide-open," while balancing the individual's interest in his reputation. *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 20 (1990) (internal quotation marks omitted).

Although today's media landscape has changed, the interests on both sides of *Sullivan*'s equation remain almost the same. On one side, *Sullivan* safeguards a First Amendment right to public debate that is "not only an aspect of individual liberty—and thus a good unto itself—but also is essential to the common quest for truth and the vitality of society as a whole." *Falwell*, 485 U.S. at 51 (quoting *Bose Corp.*, 466 U.S. at 503–04). Placing "the burden of proving truth upon media defendants who publish speech of public concern deters such speech because of the fear that liability will unjustifiably result," and "would be antithetical to the First Amendment's" central protections. *Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 777–78 (1986).

Constitutional safeguards that protect "the free flow of ideas and opinions on matters of public interest and concern," *Falwell*, 485 U.S. at 50, are just as critical today as they were sixty years ago.[3]

---

[3] During the Civil Rights Movement, libel suits became "formidable legal bludgeon[s]" for pro-segregation government officials "to swing at out-of-state newspapers whose reporters cover racial incidents." Brief of the American Civil Liberties Union and the New York Civil Liberties Union as Amici Curiae at 6, *N.Y. Times v. Sullivan*, 376 U.S. 254 (1964) (Nos. 39 & 40). By the time *Sullivan* reached the Supreme Court, national media outlets faced over $288 million in potential damages for their reporting on the Civil Rights Movement. Samantha Barbas, New York Times v. Sullivan: *Perspectives from History*, 30 Geo Mason L. Rev. F. 1, 5 (2023). *See generally* Christopher W. Schmidt, New

23-11270                    WILSON, J., Concurring                    13

Public and government officials continue to threaten libel suits, not for their common-law purpose of protecting one's character and image, but to threaten and silence dissenters and critics. *Sullivan*'s longstanding protections are critical if the press is to continue its function as the "constitutionally chosen means for keeping officials elected by the people responsible to all the people whom they were selected to serve." *Mills*, 384 U.S. at 219.[4]

On the other side, the concern about injuries to an individual's reputation are mostly unchanged. "The sort of robust political debate encouraged by the First Amendment is bound to produce speech that is critical" of public officials or public figures. *Falwell*, 485 U.S. at 51. And plaintiffs who cannot show "actual malice" may suffer some unwarranted reputational harm which cannot "easily be repaired by counterspeech." *Id.* at 52. Now, just as then, public figures "have a more realistic opportunity to counteract false

---

York Times v. Sullivan *and the Legal Attack on the Civil Rights Movement*, 66 Ala. L. Rev. 293 (2014).

[4] American press freedoms once ranked among the broadest in the world, in part because of *Sullivan*. *See International Libel & Privacy Handbook* xv–xvi (Charles J. Glasser Jr. ed., 2d ed. 2009) ("In essence, the U.S. model is based on the press-friendly moral engine that drives American media law."). But "[a]fter a century of gradual expansion of press rights in the United States, the country is experiencing its first significant and prolonged decline in press freedom in modern history." World Press Freedom Index: United States, REPORTERS WITHOUT BORDERS, https://rsf.org/en/country/united-states#laws-19525. Int'l Women's Media Found., *Journalists Under Fire: U.S. Media Report Daily Threats, Harassment and Attacks at Home* 15 (2024) (documenting "surging harassment and threats against journalists" in the United States).

statements than private individuals normally enjoy," and perhaps even more so with new technology creating new "channels of effective communication." *See Gertz*, 418 U.S. at 344.

Public criticism, even false criticism, "is not always a pleasant or painless experience, but it cannot be avoided if the political arena is to remain as vigorous and robust as the first amendment and the nature of our polity require." *Ollman*, 750 F.2d at 1002 (Bork, J., concurring). Two decades after *Sullivan*, Chief Justice Rehnquist, writing for a unanimous Supreme Court, reiterated that a state's "interest in protecting public figures from emotional distress" cannot justify denying First Amendment protection. *Falwell*, 485 U.S. at 50. Rather, the danger to reputation is one we have chosen to tolerate in pursuit of "individual liberty" and "the common quest for truth and the vitality of society as a whole." *Id.* at 50–51 (quoting *Bose Corp.*, 466 U.S. at 503–04). After all, "one of the prerogatives of American citizenship is the right to criticize public men and measures." *Id.* at 51 (quoting *Baumgartner v. United States*, 322 U.S. 665, 673–74 (1944)) (alteration adopted).

The "real world" consequences of stripping away *Sullivan*'s protections in our current media climate would do the opposite of "preserve an uninhibited marketplace of ideas," *Red Lion Broad. Co.*, 395 U.S. at 390, and "muzzle[] one of the very agencies the Framers of our Constitution thoughtfully and deliberately selected to improve our society and keep it free." *Mills*, 384 U.S. at 219.

23-11270                WILSON, J., Concurring                15

### C. Reliance Interests

Beyond *Sullivan*'s correctness and its real-world implications, "the antiquity of the precedent" and the "reliance interests at stake" counsel us to proceed with caution before calling for the Court to overturn *Sullivan*. *See Montejo*, 556 U.S. at 792–93. *Sullivan* has "become part of the fabric of American law" and been "woven into a long line of federal and state cases." Roy S. Gutterman, *Actually . . . A Renewed Stand for The First Amendment Actual Malice Defense*, 68 Syracuse L. Rev. 579, 580, 602 (2018). Its "recognition that libel law could violate the First Amendment was the critical step that made possible all the Court's subsequent defamation decisions and the many restrictions later imposed on libel law by state judges and legislatures." David A. Anderson, *The Promises of* New York Times v. Sullivan, 20 Roger Williams U. L. Rev. 1, 23 (2015).

The "evenhanded, predictable, and consistent development of legal principles" and "reliance on judicial decisions," *Payne*, 501 U.S. at 827, is "particularly important in the area of free speech for precisely the same reason that the actual malice standard is itself necessary." *Harte-Hanks Commc'ns, Inc.*, 491 U.S. at 686. First Amendment freedoms "are delicate and vulnerable, as well as supremely precious in our society. The threat of sanctions may deter their exercise almost as potently as the actual application of sanctions." *NAACP v. Button*, 371 U.S. 415, 433 (1963); *accord. Thomas v. Collins*, 323 U.S. 516, 529–30 (1945). "Uncertainty as to the scope of the constitutional protection can only dissuade protected speech—the more elusive the standard, the less protection it affords." *Harte-Hanks Commc'ns, Inc.*, 491 U.S. at 686.

Overruling *Sullivan* would be especially disruptive because the case defines "the central meaning of the First Amendment" and influenced "virtually all of the Supreme Court's subsequent First Amendment jurisprudence." Wermiel, *supra*, at 2. Casting the decision aside in favor of varied, plaintiff-friendly state libel laws would "create an inevitable, pervasive, and serious risk of chilling protected speech pending the drawing of fine distinctions that, in the end, would themselves be questionable." *Cf. Citizens United*, 558 U.S. at 327.

## II.

Out of respect for unanimous Supreme Court precedent, and the press freedoms that played a critical role in securing the civil rights many in this country hold dear, judges should reconsider their calls for the Supreme Court to overrule *Sullivan*. "For it is hard to overstate the value, in a country like ours, of stability in the law." *Knick*, 588 U.S. at 224 (Kagan, J., dissenting).